**UNITED STATES DISTRICTCOURT**
**EASTERN DISTRICT OF PENNSYLVANIA (Philadelphia)**

| | | |
|---|---|---|
| DAWN KENNEDY | : | |
| | : | |
| Plaintiff, | : | NO. 20-cv-00395-KSM |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA | : | **JURY TRIAL DEMANDED** |
| | : | |
| Defendant. | : | |

## <u>ORDER</u>

AND NOW this _____ day of _____, 2021, upon consideration of

Defendant's Motion for Summary Judgment and Plaintiff's Response in Opposition thereto, it is

hereby ORDERED and DECREED that Defendant's Motion is DENIED.

**AND IT IS SO ORDERED**.

_____
Hon. Karen S. Marston

**UNITED STATES DISTRICTCOURT**
**EASTERN DISTRICT OF PENNSYLVANIA (Philadelphia)**

DAWN KENNEDY                          :
                                      :
                    Plaintiff,        :        NO. 20-cv-00395-KSM
                                      :
        v.                            :
                                      :
CITY OF PHILADELPHIA                  :        **JURY TRIAL DEMANDED**
                                      :
                    Defendant.        :

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR**
**SUMMARY JUDGMENT**

Plaintiff hereby incorporates by reference the attached Memorandum of Law as if fully

set forth at length herein requesting denial of Defendant's Motion for Summary Judgment.

                              **WEISBERG LAW**
                              /s/ David A. Berlin
                              David A. Berlin, Esq.
                              PA Attorney ID No. 314400
                              Matthew B. Weisberg, Esq.
                              PA Attorney ID No. 85570
                              7 South Morton Ave
                              Morton, PA 19070
                              610-690-0801
                              Fax: 610-690-0880
                              Attorneys for Plaintiff

                              **MILDENBERG LAW FIRM**
                              /s/ Brian R. Mildenberg, Esq.
                              Brian R. Mildenberg, Esq.
                              PA Attorney ID No. 84861
                              1735 Market St.,
                              Suite 3750
                              Philadelphia, PA 19103
                              215-545-4870
                              Fax: 215-545-4871
                              brian@mildenberglaw.com
                              www.MildenbergLaw.com
                              Attorney for Plaintiff

**UNITED STATES DISTRICTCOURT**
**EASTERN DISTRICT OF PENNSYLVANIA (Philadelphia)**

DAWN KENNEDY                  :
                             :
                    Plaintiff,   :          NO. 20-cv-00395-KSM
                             :
          v.                 :
                             :
CITY OF PHILADELPHIA         :          **JURY TRIAL DEMANDED**
                             :
                    Defendant.   :

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT**

**I.      STANDARD**

The purpose of summary judgment is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense.  Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir.1976), cert. denied, 429 U.S. 1038 (1977). When considering a motion for summary judgment, this Court shall grant such motion "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).  When reviewing a motion for summary judgment, this Court should resolve all reasonable doubts and inferences in favor of the nonmoving party.  Arnold Pontiac–GMC, Inc. v. General Motors Corp., 700 F.Supp. 838, 840 (W.D.Pa.1988).

The inquiry into whether a "genuine issue" of material fact exists has been defined by the Supreme Court as whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "As to materiality, the substantive law will identify which facts are material."  Id.

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n. 1 (3d Cir.2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); accord Fed.R.Civ.P. 56 c. Thus, this Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56 c.

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F.Supp. 1254, 1258 (D.N.J.1994).  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Andersen, 477 U.S. at 256–57.  "A nonmoving party may not 'rest upon mere

allegations, general denials or ... vague statements ....'" Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir.1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir.1991))

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Credibility determinations are the province of the factfinder. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir.1992).

## II.    ARGUMENT

### A. Disparate Impact under Title VII

Title VII claims can be brought under a disparate impact theory, in which the plaintiff need not show discriminatory intent.

In a disparate impact case, the plaintiff must first present a prima facie case by showing that application of a facially neutral standard results in significantly discriminatory pattern. Meditz v. City of Newark, 658 F.3d 364, 370 (3d 12 Cir. 2011) (quoting NAACP v. Harrison, 940 F.2d 792, 798 (3d Cir. 1991) (citing Dothard v. Rawlinson, 433 U.S. 321, 329 (1977)))

If the plaintiff does so, "the defendant can overcome the showing of disparate impact by proving a 'manifest relationship' between the policy and job performance." El v. SEPTA, 479 F.3d 232, 239 (3d Cir. 2007) (quoting Griggs v. Duke Power Co., 401 U.S. 424, 432 (1971)); see also 42 U.S.C. § 2000e-2(k) (addressing burdens of proof in disparate impact cases); NAACP v. North Hudson Reg'l Fire & Rescue, 665 F.3d 464, 477, 482 (3d Cir. 2011) (discussing and applying business-necessity defense under Section 2000e-2(k)).

Even if the defendant proves this business necessity defense, "the plaintiff can overcome it by showing that an alternative policy exists that would serve the employer's legitimate goals as well as the challenged policy with less of a discriminatory effect." El, 479 F.3d at 239 n.9. (Cited by the Third Circuit Model Civil Jury Instructions)

      i.     *Element 1: Plaintiff has shown that hair testing for cocaine is a facially neutral employment practice, which has a discriminatory effect on African Americans compared to Caucasians.*

In this case, Plaintiff has identified a facially neutral standard, which results in a significantly discriminatory pattern.

It undisputed that the Philadelphia Police Department routinely uses hair drug testing for its officers.

Plaintiff's expert scientist, David A. Kidwell, Ph.D., concluded *inter alia* that the City's hair testing has a discriminatory impact on African Americans, and that Plaintiff suffered a false positive because of her African hair type and ethnic hair care products.

Dr. Kidwell specific conclusions include:

- African Americans are disparately impacted by false accusations of drug use (false positive from testing) when hair testing for drugs is employed. Genetics and cultural differences in how hair is cosmetically treated (imposed by those genetics) provides especially African Americans with hair that is more susceptible to contamination from the environment and thereby false accusations of drug use from mere drug exposure. (Exh. B, Kidwell Report, pg. 15)

- Because of Officer Kennedy's African hair type and cosmetic preferences, it is reasonable scientific conclusion that her positive hair test was a false positive. (Exh. B, pg. 15)

- Officer Kennedy was exposed to sources of THC in her job. Additionally, Officer Kennedy treated her hair with oils that would allow concentration and binding of THC from the environment and that exposure is greatly enhanced by the hair treatments that African Americans use. Id. at pg. 15

- The laboratory decontamination procedure is woefully inadequate. Id.

- The actual THC level in Officer Kennedy's hair was not measured and the ratio of THC to THC-COOH could not be determined. Id.

- No consensus exists in the scientific community as to what a positive hair test means - Is it use or contamination? Nor what levels constitute a positive result. Id.

- Officer Kennedy's hair was not cut to a defined length as others samples. The time frame based on the length of her hair sample was 2-7x longer than other subjects. Longer time frames allow more time for exposure and more time for "metabolites" to form after the exposure. Id.

- THC and its metabolites do not bind well to hair and are at 2000x lower levels than other drugs. This makes their analysis challenging. To generate any positive results from known marijuana users, the analytical technology needs to be stretched to its limits. Id. at pg. 16

- The laboratory confirmation analysis had a number of substantial defects and unknowns that calls into question their quantitation of THC-COOH. Id.

- An independent analysis of another sample of hair taken a few days later tested negative, and careful examination of the raw data does not indicate the presence of substantial amounts of THC or related materials. THC metabolites have been shown to be stable to many removal techniques. i.e. if Officer Kennedy had tried to generate a false negative on a second sample by cosmetic methods, she would have likely failed. Id.

- Officer Kennedy was randomly selected for drug testing and thus had no opportunity to adulterate her urine or hair specimens. Id.

- A urine specimen for Officer Kennedy taken at the same time tested negative and careful examination of the raw data does not indicate even the hint of the presence of THC metabolites. Additionally, the sample appeared normal with no physical dilution (i.e. no attempt to hide marijuana use[)]. Id.

Dr. Kidwell's supplemental repot additionally concluded, *inter alia*:

- Statistical analysis showed that hair testing by the City had a disparate impact on African Americans. Officer Kennedy is a select member of that group who was randomly chosen for hair testing and was positive. This random group had an odds ratio of 14.8 (i.e. 14.8 times more black individuals (in proportion to their population) were selected than white individuals), which was statistically significant at the 95% CI. (Exh. C, Kidwell Supp. Report, pg. 9)

- [A] number of factors such as hair color, hair texture, and cosmetic treatments all closely linked to race and culture that make African-Americans and especially African-American females more susceptible to being falsely accused of drug use. Id. at pg 1.

- Also, testing of too long a hair sample subjected Officer Kennedy to different treatment from that received by other individuals similarly situated. Id.

Plaintiff has met her burden at this stage from which a fact finder could conclude that hair drug testing has a disparate impact on African Americans compared to Caucasians. Meditz, *supra*.

As expected, Defendant's report concluded the opposite of Dr. Kidwell's report.

This "battle of the experts" is a clear dispute of fact which must be resolved by the fact finder.

At this stage, however, Plaintiff is entitled to the benefit of all reasonable inferences and summary judgment respectfully must be denied.

1. **While statistics are not required, Defendant blatantly ignores Dr. Kidwell statistical analysis showing the City's hair testing policy caused a higher percentage of false positives in African American officers.**

Dr. Kidwell statistically shows the City's hair tests disproportionally impact African Americans compared to urine tests:

In my initial expert report I delved into detail how hair testing can be racially biased. I need not repeat those details here. Suffice to say that it encompasses a number of factors such as hair color, hair texture, and cosmetic treatments all closely linked to race and culture that make African-Americans and especially African-American females more susceptible to being falsely accused of drug use. (Exh. C, Kidwell Supp. Report, pg. 1)

Through a subpoena, I eventually received part of the City's data set that clearly demonstrates this bias in a statistically significant manner. Id. (City Bates Numbers 1031 – City 1075 – produced by the City in response to Plaintiff's motion to compel (Docket No. 30)

Note that the urine proportions very closely mirror the general population in Figure 1a whereas the hair positive tests are skewed to the Black individuals.



Dr. Kidwell further concludes:

**Statistical analysis showed that hair testing by the City had a disparate impact on African Americans.** Officer Kennedy is a select member of that group who was randomly chosen for hair testing and was positive. This random group had an odds ratio of 14.8 (i.e. 14.8 times more black individuals (in proportion to their population) were selected than white individuals), which was statistically significant at the 95% CI. Id. at pg. 10

### a. While Plaintiff used statistics, the use of statistics (or any rigid mathematical formula) is not required

Defendant argues that statistics are required for Plaintiff to meet his burden.

This is false.

The case cited by Defendant: Boyle v. City of Philadelphia, 2020 WL 4459131 (E.D. Pa 2020) explained:

"[T]o establish a *prima facie* case of disparate impact in a Title VII case, a plaintiff must (1) identify a specific employment policy or practice of the employer and (2) proffer evidence, **typically statistical evidence**, (3) of a kind and degree sufficient to show that the practice in question has caused exclusion of applicants for jobs or promotions (4) because of their membership in a protected group." Stagi v. Nat'l R.R. Passenger Corp., 391 F. App'x 133, 140 (3d Cir. 2010). **If statistical evidence is used**, the Third Circuit has stated that the plaintiff must "demonstrate that the disparity in impact is sufficiently large that it is highly unlikely to have occurred at random." Id. at 137. **Usually this burden is satisfied "by the use of tests of statistical significance**, which determine the probability of the observed disparity

obtaining by chance." Id.; *see also* <u>Tabor v. Hilti, Inc.</u>, 703 F.3d 1206, 1223 (10th Cir. 2013) ("It is not enough for a plaintiff to present data showing a disparity between groups. To be reliable, the result also must be statistically significant."); <u>Luceus v. R.I.</u>, No. 15-489, 2018 WL 1626263, at *6 (D.R.I. Mar. 30, 2018) ("**There are cases, to be sure, where courts have excused a plaintiff's failure to provide statistical analysis**. But these are few, far between, and only where the raw numbers evince the most egregious disparities.").

<u>Boyle</u> does not hold what Defendant claims. Statistics are not required.

The Supreme Court has noted in several cases that statistics **may** (emphasis added) serve to establish plaintiff's prima facie case. <u>Meditz,</u> *citing* <u>*Watson v. Fort Worth Bank and Trust*</u>, 487 U.S. at 991–95 (1988); <u>*Hazelwood School Dist. v. United States*</u>, 433 U.S. 299 (1977).

There is no "rigid mathematical formula" courts can mandate or apply to determine whether plaintiffs have established a prima facie case. **If** (emphasis added) statistical evidence is used, as it typically will be in disparate impact cases, it must be "sufficiently substantial" to raise "an inference of causation." <u>Stagi v. National R.R. Passenger Corp.</u>, 2010 WL 3273173 (3rd Cir. 2010) citing <u>Watson</u>, *supra*.

This case involves a specific scientific question: whether hair drug testing has a racial disparate impact. Statistics are not the only way to answer this question.

Dr. Kidwell explains that hair drug tests have different outcomes for different races because of the composition of African American hair as well as the use of ethnic hair care products (discussed in the next section).

## 2. <u>Dr. Kidwell's explains African hair is more susceptible to false positives due to genetics and ethnic hair care products</u>

Dr. Kidwell explains:

It is well known that ethnic hair care products are often applied to African hair especially after chemical or heat straightening to keep the hair from curling due to moisture. This is most typically done by African-American females. These ethnic hair care products are basically oil or oil-glycerol mixtures. We have shown that in the case of the aminecontaining drugs, these hair care products can enhance the uptake of drugs from the environment 500 fold. Another aspect of African female hair care is that it is not washed frequently due to cosmetic reasons (i.e. you would need to straighten it again after washing or put back in hair extensions – both time

consuming processes). Additionally, African hair tends to be drier than Caucasian hair and need not be washed as frequently as well as needing oil to keep it in place.

Genetics also plays a role as African hair is typically curly. If the popular culture values straight hair, then commercial businesses provide the means to achieve that goal in providing hair care products and extensions. Straightening products strip the cuticle (Figure 1a) from the hair and make it more porous to the environment (Figure 1b). Thus, a combination of genetics and culture of perceived beauty make African hair more susceptible to influx of drugs from the environment.

Besides allowing ready entry, ethnic hair care products can enhance the uptake from the environment. THC is well known to bind to oils. It is reasonable to assume (like shown for cocaine and amphetamines) that ethnic hair care products will concentrate THC from the environment and thereby basically apply a solution of THC to the hair until the hair is washed. Because of hygiene and application of oils (as mentioned above) any solution of THC remains on the hair for a lengthy time compared to other groups. Time and higher concentrations increase the diffusion of THC into the hair. Additionally, the oil treatment provides the liquid vehicle that also facilitates this transfer. Of course, any individual could straighten their hair, apply oils, and wash it infrequently. It is just more culturally relevant to African-American females.

In summary, different hair "types" have different rates of contamination from the environment. Cosmetically treated hair, because of damage and residual chemicals, transferred drugs more readily then untreated hair. To the extent that African Americans more frequently treat their hair (for genetic and cultural reasons), they as a group would be more susceptible to environmental contamination and the resulting false positives and false accusations resulting from that contamination. (Exh. B, Kidwell Report, pg. 6-7)

    **a. Omega Laboratories' hair test was inconsistent with Plaintiff's other negative hair and urine tests taken during the same time period.**

        i. When Plaintiff's positive Omega hair test is compared to Plaintiff's negative United States Drug Testing Laboratories (USDTL) hair test, Dr. Kidwell was able to show that Omega's test was compromised by Plaintiff's ethnic hair care treatment

Dr. Kidwell explains:

[A]fter being informed of her positive test, Officer Kennedy had an independent analysis of another sample of hair taken eight days later and sent to United States Drug Testing Laboratories (USDTL). According to the report (City Bates 0979) the sample tested negative in the screening test at a sensitivity identical to that used by Omega. As the initial test was negative, the sample did not go onto confirmation. I requested the full litigation package to allow careful examination of the raw data.

If there is any THC reactive materials present they are at least half of the cutoff level of 1 pg/mg of hair. What could account for this discrepancy between USDTL negative and Omega's positive?

USDTL indicates in their collection video for hair that the collector should cut the hair to a length of 1.5". Shorter hair allows for less possibility of environmental contamination. It is my understanding that the collection process followed the video – decontamination, gloves, and cutting hair to a fixed length. USDTL decontaminates the hair before they perform the screening test. Their decontamination likely removals only superficial contamination. It would also remove hair treatment products such as oils that would be in this superficial contamination and prevent them from interfering with the initial ELISA screening test generating a false
positive result.

**Importantly, Officer Kennedy has testified that she treats the nape hair (which was tested by Omega) with "Wild Growth" (Kennedy 35:20) whereas she treats the top of her hair (which was test by USDTL) with less oil and a different brand "Cactus Oil" (Kennedy 66:23).** As ethnic hair care products have been shown to absorb nitrogencontaining drugs from the environment and reasonably be expected to do the same for THC (as discussed above), this puts the Omega hair sample at a greater risk of contamination and false positives because (1) more oil is present and (2) the oil was not removed by Omega before testing the hair.
(Exh. B, Kidwell Report, pg. 12-13)

Dr. Kidwell further explains: "because Omega does not decontaminate the hair, hair that has been treated with oils (as was Officer Kennedy's) hair can confuse the immunoassay and can produce false positives."

        ii.        Plaintiff's negative urine test

Dr. Kidwell explains:

A urine specimen for Officer Kennedy taken at the same time by the Philadelphia Police Department tested negative. Like the hair sample, I requested the full litigation package from Drug Scan (Specimen ID: 510026042, collected 3-20-19). Careful examination of the raw data does not indicate even the hint of THC metabolites at the lowest levels of testing. Furthermore, an additional urine sample collected on the initiative of Officer Kennedy was tested by LabCorp and found negative. I also requested the full litigation package for this sample but only received a summary that basically indicated that the sample was normal and negative. All the samples (hair and urine) appeared normal with no hint of evasion of the drug test.

**The easiest way to reconcile these disparate analyses is to invoke passive exposure and thereby a false positive in the Omega hair sample.**
(Exh. B, Kidwell Report, pg. 14)

In other words, Dr. Kidwell concludes Plaintiff did not <u>intentionally</u> use marijuana, but instead she was passively exposed to marijuana in her job.

This is consistent with Plaintiff's testimony that she was constantly around marijuana at work:

Q. Do you recall any time in the maybe, like, three months prior being -- coming into contact with a suspect or anyone that was smoking marijuana?

A. Oh, well, yes. Practically every night when I came to work, you know, that was -- you know, that's part of our job. We arrest people that are either selling it or smoking it.

And so every night, I was pretty much exposed to marijuana regardless of whether I was working in the Operations Room because that's where -- when the officers would arrest someone, they would bring them in. Marijuana would -- they would leave it out on the counter while they were filling out paperwork.

So, it was always -- it was always present. Like our district was the district where the 14th District and the 39th District would bring their prisoners. So, we were always a high traffic district. So we housed -- even the 5th District, we housed all three of the other districts, their prisoners and juveniles and all of that.

So, I was constantly around marijuana at work. (Exh. A, Plaintiff's Dep., 44:22).

> **b. Dr. Kidwell specifically found that Omega's failure to cut Plaintiff's hair according to protacols was a form of purposeful discrimination because "African-American female hair is very curly and difficult and time consuming to align and cut to length if is not cut during the collection process, as this sample was not."**

Among the reasons for Omega's test being inaccurate, Dr. Kidwell explained, was the length of Plaintiff's hair sample:

Officer Kennedy's hair was tested at too long of length. The laboratory had protocols to test hair cut to 1.5". That was not done in her case and thus subjected her sample to, in my opinion, different treatment from that received by other individuals similarly situated. Dr. Kadehjian need not look any future than the

Omega litigation package that shows that Officer Kennedy's hair was the longest tested in that batch (where length was provided, page 12 of 82, for his reference). One can speculate as to why this was the case. I will not do that here but **this is a form of purposeful discrimination in not following protocol. In my experience, African-American female hair is very curly and difficult and time consuming to align and cut to length if is not cut during the collection process, as this sample was not. Why the Omega collection process did not have a requirement to cut the hair to a defined length while on the head is unclear. I do note that USDTL, the laboratory where Officer Kennedy sent a second sample, did have the requirement that the collection facility cut the hair to length and it appeared to have been met in the instant case.**
(Exh. C, Kidwell Supplemental Report, pg. 7-8)

3. **Plaintiff's Omega Laboratories hair test was further compromised**

Dr. Kidwell explains that analysis of THC and THC-COOH in hair is very difficult and care must be taken by the laboratory to avoid false positives from contamination or incorrect procedures. (Exh. B, Kidwell Report, pg. 10)

Dr. Kidwell's found numerous problems with Plaintiff's hair sample from Omega Laboratories, including:

- Incorrect sample length (discussed above)
- No decontamination in initial screening test
- Insufficient precision in sample weights
- Insufficient precision in the initial test
- Lack of decontamination procedure
- Inaccurate internal standard additions
- Use of conventional standard methods linear line
- Understanding of the confirmation procedure
  (Exh. B, Kidwell Report, pg. 9-12)

a. **Omega's test is not drug specific, which violates the City's own directives**

Dr. Kidwell also notes that the Philadelphia City Directive 6.5 (City 303) states: "To ensure optimum accuracy, the tests will be drug-specific. The drug abuse screening test will consist of two tests: …"

The ELISA tests used in the initial screening by Omega clearly does not meet the requirement of being drug specific. (Exh. B, Kidwell Report, pg. 11)

Dr. Kidwell even concluded that Omega "**does not measure the THC content of hair**."

Id.

4. **Defendant's argument that the Omega hair test confirms the presence of marijuana and is predictive of drug use is incorrect**

Dr. Kidwell does not concede this point. Dr. Kidwell explains that the presence of THC-COOH (THC carboxylic acid) does not automatically prove **use** from exposure:

> The metabolism and origin of most drugs of abuse in hair have been well studied. THC has not. It is generally believed that THC-COOH is considered to be a definitive metabolite and its presence demonstrates use of marijuana. **But is THC-COOH a definitive metabolite of THC? Not really. THC is actually an unstable compound and decomposes on exposure to oxygen and light into a wide variety of uncharacterized materials.** Interestingly, the major human metabolites of THC (and the ones we find in hair) are all oxidization products at an allylic position caused by removing hydrogen atoms. Allylic hydrogens are especially prone to non-specific oxidation from just exposure to oxygen in the air, perhaps catalyzed by light.51 In the chemical synthesis of THC-COOH for the high-yield preparation of standards, oxidation can form THCCOOH.
>
> Non-specific production of THC-COOH from THC has been shown to occur over a decade ago. From unpublished work by Associated Pathologists Laboratories, they quantitated THC and THC-COOH in hair that was stored one year. Figure 3 clearly shows that THC is unstable in hair upon storage with the majority of samples showing a profound decrease in THC over a one year storage. **What is more telling is THCCOOH, the "metabolite" increases over time in the majority of the samples. Clearly this is not due to human metabolism as these are cut hair samples stored in a laboratory.** The logical conclusion is that a small fraction of THC is degrading to the specific compound THC-COOH (being tested) and the rest decomposing to unknown materials. There is some speculation that melanin may play a role in the degradation of THC as melanin is known to activate oxygen in a manner similar to Fenton oxidations.
>
> Officer Kennedy's hair was only tested for the presence of THC-COOH. Other materials must be present as the amounts indicated by the ELISA (the initial, general test) and GC/MS/MS (the specific confirmation test) do not agree. **Knowing both materials may be helpful in distinguishing use from exposure…**
> (Exh. B, Kidwell Report, pg. 8)
>
> … One of the major concerns of hair testing is what does it measure? – use or mere exposure. Effective decontamination procedures help distinguish the use vs. exposure if laboratories would only test their test. Omega's decontamination is woefully inadequate in that they rinse the hair for 5 seconds in methanol. If I assume

that this is a misprint and it actually means 5 minutes, I would still consider that amount of decontamination inadequate.
Id. at 11.

Dr. Kidwell devotes a significant portion of his reports on the inadequacies of Omega's testing – and specifically Omega's deficiencies in measuring THC-COOH (THC carboxylic acid), which undermines the ability to determine use versus exposure.

5.  **Defendant cites the <u>Green</u> case, which is not analogous**

Defendant cites <u>Green v. City of Philadelphia</u>, EDPA Case No. 19-cv-03156-JDW, which is not analogous to this case. (<u>Green</u> is currently on appeal to the Third Circuit Court of Appeals. Undersigned counsel represents <u>Green</u>. Defendant's counsel represents the City of Philadelphia in that matter).

Here, Plaintiff Dawn Kennedy retained a different expert, with a different methodology, who relied on different fact discovery.

There are several key differences between <u>Green</u> and <u>Kennedy</u>:

- Green involved a positive test for cocaine. Plaintiff involved a positive test for marijuana.

- Green was bald and the hair used for the positive test came from his chest. Here, the hair used for the positive test came from Plaintiff's neck and was saturated in cosmetic oil.

- Green tested positive three (3) times. Plaintiff tested positive once, and tested negative twice.

- Green did not obtain the same statistics from the City, and Green's expert did not run the subsequent statistical analysis.

- Green used a different expert.

- Green's expert employed a different methodology and relied on different studies.

- Green did not use ethic hair care products.

- Green's urinalysis was dilute and Defendant attacked that test as inaccurate (it was accurate). Here, Defendant's do not contest Plaintiff's urinalysis.

Notwithstanding those major factual differences in <u>Green</u>, in that case, His Honor, Judge Wolson agreed with Green that statistics **were not required** to prove a disparate impact case (contrary to the City's incorrect position in there and here that statistics are required).

Ultimately, however, Judge Wolson concluded <u>Green</u> had not met his evidentiary burden regardless of whether he used statistics or other evidence.

Here, Plaintiff's evidence includes (discussed at length above):

- A statistically significant racial disparity by hair testing when compared to urine testing.

- Plaintiff's hair that was tested was saturated in ethnic hair care products used by African American women.

- Plaintiff's other hair test, taken in the same time period, used hair not saturated in oil tested negative. Plaintiff also tested negative in a contemporaneous urinalysis.

- Plaintiff's expert found numerous deficiencies in Omega Laboratories testing, which cause false positives.

None of these specific facts were present in the <u>Green</u> case.

The bottom line is that Plaintiff's expert concluded that the City's hair tests cause a racial disparity and Plaintiff's positive hair test was a false positive specifically because her African hair type and cosmetic preferences.

In sum, Plaintiff must be given the benefit of all reasonable inferences at this stage.

Plaintiff has met her burden at this stage from which a fact finder could conclude that hair drug testing has a disparate impact on African Americans compared to Caucasians. <u>Meditz</u>, *supra*. <u>Meditz</u>, *supra*.

      ii.     *Element 2: The Defendant employer must show a business necessity*

It is undisputed that the City has a business necessity to ensure its police officers do not use illicit drugs.

> iii.     *Element 3: An alternative policy exists that would serve the employer's legitimate goals as well as the challenged policy with less of a discriminatory effect: urine testing*

The City contends hair testing is scientifically accurate.

Plaintiff's expert, however, opines that hair drug testing has a racial bias and is scientifically invalid (outlined above).

Here again, there is a scientific dispute of fact about the reliability and racial bias of hair tests, which must be resolved by the fact finder.

Additionally, the City does not contend that urine is inaccurate or has a racial bias. In fact, the City admits it also routinely uses urine testing.

Dr. Kidwell has shown the City actively uses a hair test where African Americans are 14.8 times more positive than Caucasians. Urine tests, by comparison, do not show that racial disparity. (Exh. B, pg. 10).

At this stage, Plaintiff has adduced evidence to show that an alternative policy exists (urine) that would serve the City's legitimate goals of having an illicit drug-free workforce, but with a less discriminatory effect. El v. Septa, *supra*.

Dr. Kidwell additionally outlines alternatives to the use of hair testing in a drug-deterrent program:

> In a safety-sensitive job drug use can be a concern, and effective drug testing deters drug use. The Philadelphia Police Department employs drug testing on a random basis with both hair and urine as the test matrices. Random testing is more effective than scheduled testing as employed by other police departments and they should be commended for that part of their approach. Some drugs are more readily detected by hair testing than urinalysis. As used by the Philadelphia Police Department, hair testing could identify individuals who have used drugs and those that have been merely exposed to drugs. One cannot determine drug use from a single test. For

example with cocaine, it has been shown that FBI agents have cocaine positive hair even after decontamination. It is interesting that the Philadelphia Police Department takes both urine and hair, with hair being randomly tested in about 10% of the total samples and urine tested with all the samples. Either sample being positive is grounds for dismissal.

The Philadelphia Police Department could use a more enlightened approach to drug testing to ensure a drug-free workforce. For example, they should take NO adverse action based solely on a hair test as hair measures exposure to drugs. The hair test would only be used to classify individuals into those whose job, contacts, hair type, and cosmetic practices, make them suitable for testing by hair analysis. If an individual was detected to be positive OR exposed to drugs by a hair test, then that individual would be placed in a frequent, random urinalysis program. Only if that individual were positive by urinalysis, would adverse action be taken. As the Philadelphia Police Department already uses urinalysis as their major drug testing matrix, a few extra samples should not be a financial or logistic burden, especially when compared to replacing a trained police officer.

(Exh. B, Kidwell Report, pg. 14)

**B.  Monell**

A § 1983 claim against a municipality can proceed in two ways: a plaintiff may put forth that an unconstitutional policy or custom of the municipality led to his or her injuries, **or** that they were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice. Forrest v. Parry, 930 F.3d 93 (3rd Cir., 2019)

Where municipal liability is premised on an unofficial custom, the plaintiff must "produce facts tending to show the [municipality] knew of a pattern of constitutional violations or that such consequences were so obvious the [municipality's] conduct can only be characterized as deliberate indifference." Pelzer v. City of Phila., 656 F. Supp. 2d 517, 533 (E.D. Pa. 2009). "In addition to proving that an unlawful policy or custom existed, a plaintiff also bears the burden of proving that such a policy or custom was the proximate cause of the injuries suffered." Watson, 478 F.3d at 156.

For example, in Berg v. County of Allegheny, 219 F.3d 261 (2000), the court focused on whether municipal policymakers had either actual or constructive knowledge of the practice

for issuing warrants.  *See* <u>Id</u>. at 276 ("We believe it is a more than reasonable inference to suppose that a system responsible for issuing 6,000 warrants a year would be the product of a decision maker's action or acquiescence.").

The <u>Berg</u> court stated, however, that where the custom in question does not itself *constitute* the constitutional violation – but rather is alleged to have led to the violation – the plaintiff must additionally meet the deliberate-indifference test set forth in <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378 (1989): "If ... the policy or custom does not facially violate federal law, causation can be established only by 'demonstrat[ing] that the municipal action was taken with "deliberate indifference" as to its known or obvious consequences.'" <u>Berg</u>, 219 F.3d at 276 (quoting <u>Board of County Comm'rs of Bryan County v. Brown</u>, 520 U.S. 397, 407 (1997)).

Here, Plaintiff has identified an unconstitutional policy and custom, which led to the loss of her employment: The City's hair testing has a discriminatory impact on African Americans, and Plaintiff specifically suffered a false positive because of her African hair type and use of ethnic hair care products.

Like <u>Berg</u>, it is a more than reasonable inference to suppose that a system responsible for using a test where African Americans are <u>14.8 times </u>more positive than Caucasians, is the product of a decision maker's action or acquiescence. (Exh. B, pg. 10).

**C. <u>Equal Protection</u>**

To state a claim for an Equal Protection Clause violation, a plaintiff must show that: (1) compared with others similarly situated he was selectively treated and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person. Cash v. Wetzel, 8 F.Supp.3d 644 (E.D.Pa 2014)

Here, Defendant argues that Plaintiff cannot show intentional discrimination – that is not true.

As discussed above, the City actively uses a test where African Americans are 14.8 times more positive than Caucasians. (Exh. B, pg. 10).

The City of Philadelphia's Medical Director of Employee Medical Services, Dr. George Hayes was deposed in this case. Dr. Hayes has worked for the City for 35 years. (Exh. E, Dr. Hayes dep., 7:9)

Dr. Hayes testified that he has been independently aware of the possibility of a racial disparity from hair drug testing for about 15 years. Dr. Hayes testified:

> Q. Have you ever heard of that concept before? (The concept of racial disparity in hair drug testing)
> A. Yes.
> Q. When did you hear about that concept?
> A. It had to be at least I would say 15 years ago.
> Q. And how did you learn about that?
> A. Actually, there have been some studies done that point to the issue of hair being something that may give you some partial or some different results in different hair, colors as well as hair thickness. So they've done studies historically. Id. at 10:3

The City continues to uphold Plaintiff's termination based on a test, which it knows is scientifically and constitutionally invalid.

By virtue of Plaintiff filing this lawsuit and producing Plaintiff's expert report, Defendant is on additional notice of the racial bias in hair testing, but the City continues to routinely use hair testing.

The City has not treated Plaintiff the same as similarly situated Caucasian officers, because the City is using a hair test, which it knows causes more false positives for African Americans than for Caucasians.

**WEISBERG LAW**
/s/ David A. Berlin
David A. Berlin, Esq.
PA Attorney ID No. 314400
Matthew B. Weisberg, Esq.
PA Attorney ID No. 85570
7 South Morton Ave
Morton, PA 19070
610-690-0801
Fax: 610-690-0880
Attorneys for Plaintiff

**MILDENBERG LAW FIRM**
/s/ Brian R. Mildenberg, Esq.
Brian R. Mildenberg, Esq.
PA Attorney ID No. 84861
1735 Market St.,
Suite 3750
Philadelphia, PA 19103
215-545-4870
Fax: 215-545-4871
brian@mildenberglaw.com
www.MildenbergLaw.com
Attorney for Plaintiff

**UNITED STATES DISTRICTCOURT**
**EASTERN DISTRICT OF PENNSYLVANIA (Philadelphia)**

| | | |
|---|---|---|
| DAWN KENNEDY | : | |
| | : | |
| Plaintiff, | : | NO. 20-cv-00395-KSM |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA | : | **JURY TRIAL DEMANDED** |
| | : | |
| Defendant. | : | |

**CERTIFICATE OF SERVICE**

I, David A. Berlin, Esquire, hereby certify that on this 5th day of April 2021, a true and

correct copy of the foregoing Plaintiff's Response in Opposition to Defendant's Motion for

Summary Judgment was served via ECF and e-mail, upon the following parties:

Kia Ghee, Esq
City of Philadelphia Law Dept.
1515 Arch Street, 16th Floor
Philadelphia, PA 19102

                                            **WEISBERG LAW**
                                            /s/ David A. Berlin
                                            David A. Berlin, Esq.
                                            PA Attorney ID No. 314400
                                            Matthew B. Weisberg, Esq.
                                            PA Attorney ID No. 85570
                                            7 South Morton Ave
                                            Morton, PA 19070
                                            610-690-0801
                                            Fax: 610-690-0880
                                            Attorneys for Plaintiff

                                            **MILDENBERG LAW FIRM**
                                            /s/ Brian R. Mildenberg, Esq.
                                            Brian R. Mildenberg, Esq.
                                            PA Attorney ID No. 84861
                                            1735 Market St.,
                                            Suite 3750
                                            Philadelphia, PA 19103

215-545-4870
Fax: 215-545-4871
brian@mildenberglaw.com
www.MildenbergLaw.com
Attorney for Plaintiff