

# Compressed Transcript of the Testimony of
## GEORGE T. HAYES, M.D., 4/30/20

**Case:** Kennedy v. City of Philadelphia, et al.

Summit Court Reporting, Inc.
Phone: 215.985.2400
Fax: 215.985.2420
Email: depo@summitreporting.com
Internet: www.summitreporting.com

Case 2:20-cv-00395-KSM   Document 35-7   Filed 04/05/21   Page 2 of 12

Kennedy v. City of Philadelphia, et al.                                    GEORGE T. HAYES, M.D., 4/30/20

Page 1

```
           IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA

                          - - -

DAWN KENNEDY,          : CIVIL ACTION
                       :
      Plaintiff,       :
                       :
                       :
      VS.              :
                       :
                       :
CITY OF PHILADELPHIA,  :
et al.,                :
                       :
      Defendant.       : NO. 20-CV-0395

                          - - -
          Teleconference deposition of GEORGE T.
     HAYES, M.D., taken on Thursday, April 30, 2020,
     beginning at approximately 12:00 p.m., before
     Robin Frattali, Registered Professional Reporter
     and Notary Public.
                          - - -


              SUMMIT COURT REPORTING, INC.
           Certified Court Reporters and Videographers
               1500 Walnut Street, Suite 1610
                Philadelphia, Pennsylvania 19102
         424 Fleming Pike, Hammonton, New Jersey 08037
         (215) 985-2400 * (800) 447-8648 * (609) 567-3315
                   www.summitreporting.com
```

Page 2

```
 1   APPEARANCES:
 2
 3   WEISBERG LAW, P.C.
     BY:  DAVID A. BERLIN, ESQUIRE
 4   7 South Morton Avenue
     Morton, Pennsylvania 19070
 5   (610) 690-0801
     dberlin@weisberglawoffices.com
 6   Counsel for Plaintiff
     (Present via Teleconference)
 7
 8
     CITY OF PHILADELPHIA LAW DEPARTMENT
 9   BY:  TIFFANY R. ALLEN, ESQUIRE
     Assistant City Solicitor
10   Labor and Employment Unit
     One Parkway Building
11   1515 Arch Street
     16th Floor
12   Philadelphia, Pennsylvania 19102
     (267) 626-9016 (cell)
13   tiffany.r.allen@phila.gov
     Counsel for Defendant
14   (Present via Teleconference)
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1                  I N D E X
 2                      - - -
 3   WITNESS:                         PAGE
 4   GEORGE T. HAYES, M.D.
 5   EXAMINATION
 6   By Mr. Berlin                       5
 7   By Ms. Allen                       25
 8
 9
10
                       EXHIBITS
11
12                          PAGE FIRST
     EXHIBIT NO.   DESCRIPTION   REFERENCED
13
14
15        (No exhibits were marked.)
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1          DEPOSITION SUPPORT INDEX
 2
 3   DIRECTIONS NOT TO ANSWER:
 4   PAGES:    None
 5
 6   REQUESTS FOR DOCUMENTS OR INFORMATION:
 7   PAGES:    None
 8
 9   STIPULATIONS AND/OR STATEMENTS:
10   PAGES:    5
11
12   MARKED QUESTIONS:
13   PAGES:    None
14
15
16
17
18
19
20
21
22
23
24
```

Case 2:20-cv-00395-KSM   Document 35-7   Filed 04/05/21   Page 3 of 12

Kennedy v. City of Philadelphia, et al.                                              GEORGE T. HAYES, M.D., 4/30/20

Page 5

1  THE REPORTER: Usual
2  stipulations?
3  MR. BERLIN: Yes.
4  MS. ALLEN: Yes.
5  - - -
6  (By agreement of counsel, the
7  reading, signing, sealing, certification
8  and filing are waived; and all objections,
9  except as to the form of the question, are
10 reserved until the time of trial.)
11 - - -
12 GEORGE T. HAYES, M.D., having
13 been first duly sworn to tell the truth, was
14 examined and testified as follows:
15 - - -
16 EXAMINATION
17 - - -
18 BY MR. BERLIN:
19 Q. Okay. Dr. Hayes, my name is David
20 Berlin. I'm the attorney for the plaintiff, Dawn
21 Kennedy. We met a few months ago when I had a
22 deposition with you for another case, so I know
23 you're familiar with the process. I do appreciate
24 your time.

Page 6

1  A. Exactly.
2  Q. Yes. So I'll just give the basic
3  instructions and then we'll get into it.
4  First all, do you understand
5  that you're under oath today?
6  A. Yes.
7  Q. Do you understand that you have an
8  obligation to tell the truth?
9  A. Yes.
10 Q. Are you under the influence of any
11 medications that could affect your ability to
12 testify?
13 A. No.
14 Q. As you know, because we're on the
15 phone, if you can't hear me, just let me know, and
16 also, I would ask that you let me just give my
17 full question, and then I'm going to pause, and
18 I'll give you a full amount of time to respond.
19 Okay?
20 A. Yes.
21 Q. At some point during the deposition,
22 it's possible that the opposing counsel might
23 object. That's totally fine. When that happens,
24 you and I can both stop speaking, we'll let her

Page 7

1  make her objection, and then you can go ahead and
2  answer my question if you understand it. Okay?
3  A. Yes.
4  Q. All right. So let's get started. And
5  again, some of this is going to be the same as
6  what happened in the last deposition, but I just
7  have to do it again for the record, so just bear
8  with me.
9  How long have you worked for
10 the City of Philadelphia?
11 A. For 35 years.
12 Q. And what's your current title?
13 A. Medical Director of Employee Medical
14 Services.
15 Q. And how long have you had that title?
16 A. For the entire time.
17 Q. Okay. Do you know how the
18 Philadelphia Police Department selects what types
19 of drug tests to administer on the -- on its
20 police officers?
21 A. Yes.
22 Q. How -- what's the process? How is it
23 done?
24 A. It really depends upon whether you're

Page 8

1  a full-time police officer versus whether you are
2  an applicant. Which category would you like for
3  me to address?
4  Q. Well, for example, how does the City
5  of Philadelphia decide the types of drug tests to
6  use? I know there's different kinds, like
7  urinalysis or a hair test. How does the City pick
8  the test?
9  A. I can't tell you how exactly they pick
10 the test. I can only say that over time the urine
11 was the initial test that was done, and at some
12 point a number of years ago, and I don't know
13 exactly how long ago, it was decided that hair
14 testing would be done as well, but the specific
15 how they did that, I can't tell you other than
16 that it was a consensus based on probably multiple
17 individuals.
18 Q. Do you know who made the decision to
19 start using hair tests?
20 A. No.
21 Q. Were you involved in the decision?
22 A. Not the decision, itself. We -- I was
23 involved in the -- carrying that process out to --
24 the evaluation process of the hair.

Page 9

1   Q.  Is there like a working group or a
2   committee that decides -- like that does the
3   evaluation?
4   A.  Could you ask me that in a little
5   greater detail?
6   Q.  Yeah.
7       Is there some sort of committee
8   that sets the best practices for testing, or
9   decides what test to use?
10  A.  I'm not aware of a definitive
11  committee.  I know that it's carried out -- the
12  action, itself, of doing the physical hair testing
13  is carried out by the Internal Affairs unit.
14  There is a unit within the Police Department that
15  does make these decisions, or decides on the
16  mechanisms of how it's done and who will do it,
17  but I'm not -- I don't interact with those people.
18  Q.  Just to be clear, I don't want to know
19  anything that you've talked about with the City's
20  attorneys, that's attorney-client privileged
21  information, but besides them, have you ever had
22  any discussions with people that work for the City
23  of Philadelphia about whether or not the hair drug
24  test has any kind of discriminatory impact on

Page 10

1   African-Americans?
2   A.  No.
3   Q.  Have you ever heard of that concept
4   before?
5   A.  Yes.
6   Q.  When did you hear about that concept?
7   A.  It had to be at least I would say 15
8   years ago.
9   Q.  And how did you learn about that?
10  A.  Actually, there have been some studies
11  done that point to the issue of hair being
12  something that may give you some partial or some
13  different results in different hair, colors as
14  well as hair thickness.  So they've done studies
15  historically.
16      I was recently at a Medical
17  Review Officer recertification and that issue came
18  up, and it's the same information that has been
19  around for the last 15 years, and that is that if
20  you expose the same individual -- if you're doing
21  the testing process to the same level of drug, be
22  it marijuana or something else, and you test that
23  person's hair that has blond hair versus red hair
24  versus brunette hair or very dark hair, that the

Page 11

1   dark-haired person, when tested at the same point
2   after exposure, will have a higher level of
3   whatever drug it is.  So that's been a historical
4   fact.
5       And there's also a historical
6   fact that because of color of most individuals who
7   are black, the hair color and the hair thickness,
8   that they fall into that category as well.
9   Q.  How long have you known about that
10  concept?
11  A.  Well, it's -- it's been something
12  that's been around for a long period of time, and
13  it's something that I think that most
14  toxicologists are aware of.
15      And historically, it's -- at
16  least from the Medical Review Officer's point of
17  view, if we do commericial driver's license
18  testing as a part of that program, hair has not
19  been included in that process for testing
20  because the question is they didn't want to get
21  into an issue that looks at some bias or --
22  regarding hair color or that would offer an issue.
23      So therefore, hair testing has
24  not yet been incorporated into the Federal program

Page 12

1   for workplace drug testing.
2   Q.  Okay.  And I appreciate that
3   information, but my question is just simply how
4   long have you known about the concept.
5   A.  Oh, I'm sorry.  I thought -- okay.
6   Please forgive me.
7       Again, 15 years.
8   Q.  Okay.  And is there anyone at the
9   City, that works for the City, that's responsible
10  for examining whether or not the hair drug test is
11  the best practice, or could potentially have a
12  discriminatory impact?
13  A.  Not that I'm aware of.  I'm certain
14  that it really comes from the level of the
15  Commissioner, but I can't tell you who those
16  parties would be or who those parties are.
17  Q.  If you -- I'm not asking for a
18  conclusion, I'm just saying if you did learn that
19  there was a discriminatory impact, I'm not saying
20  that you have to agree with that, I'm saying if
21  you did learn that, would it be part of your role
22  to notify the City?
23  A.  Well, yes, it would be, and I think
24  that what I just related to you is something that

Case 2:20-cv-00395-KSM   Document 35-7   Filed 04/05/21   Page 5 of 12

Kennedy v. City of Philadelphia, et al.                                GEORGE T. HAYES, M.D., 4/30/20

Page 13

1  has -- people have been aware of, toxicologists
2  have been aware of that, and I think that that's
3  something that -- however, it has not been so
4  significant from the point of view of those who
5  had decided that, that it was an issue, that would
6  override or stop them from doing the testing
7  process.
8      Q.   Are you a toxicologist, by the way?
9      A.   No.
10     Q.   Okay. Does the City of Philadelphia
11 employ toxicologists?
12     A.   Not directly. Usually -- I mean, what
13 happens is that for urine or hair testing, the lab
14 that does the testing, itself, will supply
15 toxicologists if there are questions. So if I
16 have a question regarding hair or urine,
17 there's -- I would contact the toxicologist from
18 either lab that's actively doing that test for us
19 and question them.
20     Q.   Do you think you're qualified to know
21 whether the hair drug test has a discriminatory
22 impact?
23     A.   No, I do not, to be very honest with
24 you. I can only recite to you what I recited

Page 14

1  previously based on information that's been
2  related to me from the experts.
3      Q.   When information has been related to
4  you, did you ever convey that information to
5  decision makers at the City about the test?
6      A.   The answer to that is no, because as I
7  said initially, I was not actively a part of that
8  process of deciding to do hair testing.
9      Q.   The practice or policy of doing hair
10 testing by the City, is that ever revisited from
11 time to time?
12     A.   I can't answer that honestly because I
13 know that questions have come up, but I don't know
14 if there's a mechanism for it to periodically be
15 evaluated. I think that that is something that
16 would be an appropriate thing to be done
17 periodically, but again, that's decided from
18 usually the level of the Commissioner and those
19 people who are directing her accordingly. Him or
20 her.
21     Q.   Okay. I guess I'm just trying to
22 learn a little bit about the process. I mean, how
23 would the Commissioner -- if you know, how would
24 the Commissioner learn about this kind of issue?

Page 15

1      A.   Okay. Again, I'm -- I can't tell you
2  how. I can only tell you that within the hiring
3  process, and within the internal workings of the
4  Police Department, which I am really not familiar
5  with, I don't -- I really don't interact directly
6  with those decision makers, but they would, I'm
7  certain, look at the most recent data to decide if
8  this is something that's worthwhile, or are they
9  willing to take a chance, based on their concerns
10 regarding drugs, whether there is any validity,
11 and if that validity is something that has stood
12 up.
13          I don't know all the legal
14 interactions or ramificaters of drug testing done
15 throughout the country, but undoubtedly, this
16 issue of hair color, texture, has been something
17 that's been on the -- on the plate in regard to
18 hair testing from the very onset.
19     Q.   Okay. What is your specific role with
20 the hair and drug testing? For example, when an
21 officer has a positive test, are you involved in
22 that?
23     A.   Yes.
24     Q.   So what is your involvement?

Page 16

1      A.   If an officer -- Internal Affairs,
2  actually, for the Police Department does all the
3  hair testing. The individuals in that group that
4  do the testing are certified for doing the testing
5  process.
6           What happens, if a test comes
7  back positive, they bring that result to me. We
8  have a Sergeant Williams, who works out of our
9  office, from Internal Affairs. I would review the
10 data and look at the results, have the officer
11 brought in, who would sit down with the Sergeant
12 and question that person regarding potential
13 exposure, be it environmental exposure or taking
14 medications, things of that nature, that might
15 give rise to the reason why there is a positive
16 drug test on the hair, whether there's been an
17 environmental exposure say at work or not at work,
18 and as well as medications.
19          One of the things that you
20 question now also is, because of the use of
21 medical marijuana, whether they might be using a
22 drug as a medical marijuana agent, and it's been
23 decided that police officers know that medical
24 marijuana is not a reasonable acceptance for

4 (Pages 13 to 16)

Case 2:20-cv-00395-KSM   Document 35-7   Filed 04/05/21   Page 6 of 12

Kennedy v. City of Philadelphia, et al.                    GEORGE T. HAYES, M.D., 4/30/20

Page 17

1  having a positive urine or hair sample.
2      Q.   Okay.  Well, I'll represent to you
3  that for this case, Dawn Kennedy had her
4  deposition yesterday, and one of the things she
5  said, she represented at her deposition -- or I'll
6  represent that she said was that Sergeant Williams
7  told her she can have a re-test but that the
8  re-test wouldn't change the City's decision to
9  terminate her.
10          Do you know anything about
11 that?
12     A.   No, I don't know anything about that
13 specifically.  I do know that for hair testing --
14 no, I really don't know anything.
15          I know for urine we do a second
16 sample, an A and B split, depending upon the --
17 the amount of hair that a person might have, and
18 it's collected usually -- I was of the impression,
19 and I might be wrong, that all the hair that's
20 collected is tested, and there's no second sample
21 to have available.
22          The second sample would be the
23 sample that you would test or re-test for urine,
24 but I'm not clear whether that's true for hair or

Page 18

1  not.
2      Q.   Do you recall Dawn Kennedy's case
3  specifically?
4      A.   I've read my notes, and I did meet
5  with her on 3/27 with Sergeant Williams, but I
6  can't remember her case in any greater detail.
7      Q.   Do you recall if Dawn mentioned that
8  she was using certain hair products?
9      A.   Yes.
10     Q.   Did that matter to you?
11     A.   Well, there are no hair products, that
12 I'm aware of, that might give rise to a positive
13 hair from marijuana.
14          Now, we quite often run across
15 this situation where a person might --
16 particularly today, might be taking CBD oil, and
17 CBD oil, you can use it on your hair, you can use
18 products that have hemp, because CBD oil comes
19 from hemp, and there can be -- and CBD oil has
20 cannabinoids in it, because CBD is a -- the active
21 component that we -- supposedly use is cannabinol.
22          There are hundreds of types of
23 cannabinols, and there's a cross-reactivity, about
24 a 13 percent cross-reactivity, when we've -- when

Page 19

1  I've looked up, that you may have with CBD.  If
2  you use a CBD product, be it a hair product, or
3  oil intake product, or a liniment or something,
4  there's a likelihood that you may get a
5  cross-reactivity with CBD.
6           Even in those cases, those
7  cases historically have been, from the
8  department's point of view -- because there's a
9  directive, I believe, that says you can't use
10 products that might potentially have THC,
11 tetrahydrocannabinol, that those are not
12 acceptable reasons for having a positive urine.
13 That's been historically Internal Affairs and the
14 Police Department's take on that.
15     Q.   Do you know if you told Dawn Kennedy
16 when you met her whether or not you thought that
17 the test was accurate or valid?
18     A.   Well, I can't tell you specifically
19 about Ms. Kennedy, but I can say to you that my
20 impression is that the test, itself, from a
21 chemical and toxicology -- toxicological point of
22 view, is valid.
23          I mean, I believe -- I don't
24 believe that there is anything that's done

Page 20

1  intentionally to move one way or another, but
2  it -- I think that when you look historically at
3  hair testing, there have always been questions of
4  whether there may be some bias in one way or
5  another.
6      Q.   Well, let me clarify my question,
7  then.  Do you know if you told Dawn Kennedy that
8  you thought there was anything valid or invalid
9  about her specific test?
10     A.   Not that I'm aware of, and that would
11 not be something that -- that I would historically
12 see, but I would -- as I'm talking to you, I would
13 say the same thing to the patient, the things that
14 I've stated to you.
15     Q.   Okay.  I'll just make a
16 representation, and this is -- I'm not -- it's not
17 word for word, I'm paraphrasing, but my memory is
18 that yesterday she said something like you told
19 her that you thought her particular test was, I'm
20 just quoting, like she said BS.
21          Do you remember anything like
22 that?
23     A.   I don't think I would say that.  When
24 our meeting was done, actually, or anybody, I

Case 2:20-cv-00395-KSM   Document 35-7   Filed 04/05/21   Page 7 of 12

Kennedy v. City of Philadelphia, et al.                    GEORGE T. HAYES, M.D., 4/30/20

Page 21

don't normally respond in that way, and I would not respond in that way because I know that the test, itself, is valid, and actually, Sergeant Williams is with me when I'm meeting with her, so that's not my normal way of responding.

Q. Is there anything in the documents you've looked at for Dawn Kennedy that make you question her particular test?

A. Not the specifics of the test, no, not at all. I think that it was, based on what I can see, the collection process, which we call the chain of custody, is intact. So I can't say there's any, you know, variance as far as that's concerned.

Q. Did you ever learn whether Dawn was around marijuana at times with her job, like there was, you know, for example, marijuana in the police station a lot and things like that, not because they were using it recreationally, but from drug arrests?

A. No, I'm not aware. And that's something that at least the labs -- one of the things that you talk about when you do hair testing is the washing of the product, itself,

Page 22

that's another issue, whether certain hairs, because of their -- their nature or because of their texture, whether it releases or does not release potential environmental exposure to a chemical.

So the washing process historically has been a question, whether people with darker hair or people with a certain quality hair, thicker hair, whether their hair samples might be positive for longer periods of time, or there may be external factors involved with a positive sample.

That's something that has been thought about and has historically been looked at, but it's something that has not been a reason why a hair sample is deemed not acceptable.

Q. If Dawn was around marijuana a lot through her job, would that be taken into account in her case that we're here for?

A. No.

Q. And I heard your previous answer, I don't mean to disregard it or anything, but if Dawn was around marijuana a lot through her job, would that have mattered?

Page 23

A. Because I'm not a toxicologist, I can say I honestly don't know. I have no reason for offering an opinion in regards to that.

I can only tell you that -- that environmental exposure is something that would concern me, and particularly now because with vaping of THC products you can be exposed to marijuana in the environment and not even be aware, because vaping THC doesn't give you the same smell exposure or -- you know, that smoking marijuana, itself, does.

So when you vape the chemical, and a lot of -- medically you are able to collect that now -- in the State of Pennsylvania you're able to do that, you might be around someone smoking marijuana and not be aware of that.

Q. Do you know if the City of Philadelphia or the Police Department, the Philadelphia Police Department, has considered using an alternative test that would potentially not have a discriminatory impact?

A. No. I mean, I -- you know, there is -- there's saliva testing. There's urine testing. Their's hair testing. The thing about

Page 24

hair, hair gives you a longer window of potential exposure. That can be a positive thing if your employee -- you want to see if there's some historical event, or it can be a negative thing if you are in a situation where someone may have been accidentally exposed to a product, and so the window of time, it runs, and it depends on what the party is looking for.

When you're looking at applicants, I think that it's something that -- and I think it's something that's good because you can look back and see what -- it gives you a potential 90-day period of time, or sometimes longer if it's body hair, a window of potential exposure, but that's all I can say. I can't tell you whether it's something that should or should not be done.

Q. Just give me one second.

A. Take your time.

Q. Do you know whether Dawn Kennedy was offered the opportunity to resign instead of being terminated?

A. I don't know that.

Q. Do you know if it's common when

Case 2:20-cv-00395-KSM  Document 35-7  Filed 04/05/21  Page 8 of 12

Kennedy v. City of Philadelphia, et al.  GEORGE T. HAYES, M.D., 4/30/20

Page 25

1  Philadelphia police officers test positive for
2  drugs that they are given some sort of window
3  where they can resign or otherwise be terminated
4  within a certain short period of time?
5    A.  Honestly, again, that's an Internal
6  Affairs action, and I'm -- really am not familiar
7  with that at all.
8    Q.  One sec.
9        MR. BERLIN:  All right.  That's
10   all I have, but the opposing counsel might
11   have something for you.
12  BY MS. ALLEN:
13    Q.  Hi, Dr. Hayes.
14    A.  Yes.
15    Q.  Just some really quick questions.  I
16  wanted to go back to when you were asked about the
17  decision-making process to use hair tests.
18    A.  Yes.
19    Q.  Do you know if Philadelphia police
20  officers are under a contract?
21    A.  Yes.  There is a union contract that
22  the Philadelphia police officers work under, yes.
23    Q.  And do you know if hair testing or
24  hair testing procedures are agreed upon by the

Page 26

1  union and members of the City or Police
2  Department?
3    A.  I know there are certain directives
4  that -- that relate to urine and hair, but I don't
5  know if that's a part of the contractual process.
6  I really don't.
7        MS. ALLEN:  Okay.  Thank you.
8    That's all I had.
9        THE WITNESS:  Thank you.
10       MR. BERLIN:  Thanks for your
11   time, Dr. Hayes.
12
13
14       - - -
15
16       (Whereupon, at 12:30 p.m., the
17   witness was excused and the deposition was
18   concluded.)
19
20       - - -
21
22
23
24

Page 27

1            C E R T I F I C A T E
2
3       I, ROBIN FRATTALI, Registered
4  Professional Reporter, do hereby certify that the
5  proceedings, evidence, and objections noted are
6  contained fully and accurately in the notes taken
7  by me of the preceding deposition, and that this
8  copy is a correct transcript of the same.
9
10
11
12       _____
13       ROBIN FRATTALI
14       Registered Professional
15       Reporter - Notary Public
16
17
18
19       The foregoing certification does not
20  apply to any reproduction of the same by any
21  means, unless under the direct control and/or
22  supervision of the certifying reporter.
23
24

Case 2:20-cv-00395-KSM   Document 35-7   Filed 04/05/21   Page 9 of 12

Kennedy v. City of Philadelphia, et al.                                GEORGE T. HAYES, M.D., 4/30/20

**A**
ability 6:11
able 23:13,15
acceptable 19:12
    22:16
acceptance 16:24
accidentally 24:6
account 22:18
accurate 19:17
accurately 27:6
action 1:5 9:12 25:6
active 18:20
actively 13:18 14:7
address 8:3
administer 7:19
Affairs 9:13 16:1,9
    19:13 25:6
affect 6:11
African-Americans
    10:1
agent 16:22
ago 5:21 8:12,13
    10:8
agree 12:20
agreed 25:24
agreement 5:6
ahead 7:1
al 1:9
Allen 2:9 3:7 5:4
    25:12 26:7
alternative 23:20
amount 6:18 17:17
and/or 4:9 27:21
answer 4:3 7:2 14:6
    14:12 22:21
anybody 20:24
APPEARANCES
    2:1
applicant 8:2
applicants 24:10
apply 27:20
appreciate 5:23
    12:2
appropriate 14:16
approximately 1:15
April 1:14
Arch 2:11
arrests 21:20
asked 25:16
asking 12:17
Assistant 2:9
attorney 5:20
attorney-client 9:20
attorneys 9:20
available 17:21
Avenue 2:4

aware 9:10 11:14
    12:13 13:1,2
    18:12 20:10 21:21
    23:9,16

**B**
B 17:16
back 16:7 24:12
    25:16
based 8:16 14:1
    15:9 21:10
basic 6:2
bear 7:7
beginning 1:15
believe 19:9,23,24
Berlin 2:3 3:6 5:3
    5:18,20 25:9
    26:10
best 9:8 12:11
bias 11:21 20:4
bit 14:22
black 11:7
blond 10:23
body 24:14
bring 16:7
brought 16:11
brunette 10:24
BS 20:20
Building 2:10

**C**
C 27:1,1
call 21:11
cannabinoids
    18:20
cannabinol 18:21
cannabinols 18:23
carried 9:11,13
carrying 8:23
case 5:22 17:3 18:2
    18:6 22:19
cases 19:6,7
category 8:2 11:8
CBD 18:16,17,18
    18:19,20 19:1,2,5
cell 2:12
certain 12:13 15:7
    18:8 22:1,8 25:4
    26:3
certification 5:7
    27:19
certified 1:21 16:4
certify 27:4
certifying 27:22
chain 21:12
chance 15:9

change 17:8
chemical 19:21
    22:5 23:12
City 1:9 2:8,9 7:10
    8:4,7 9:22 12:9,9
    12:22 13:10 14:5
    14:10 23:17 26:1
City's 9:19 17:8
CIVIL 1:5
clarify 20:6
clear 9:18 17:24
collect 23:13
collected 17:18,20
collection 21:11
color 11:6,7,22
    15:16
colors 10:13
come 14:13
comes 12:14 16:6
    18:18
commericial 11:17
Commissioner
    12:15 14:18,23,24
committee 9:2,7,11
common 24:24
component 18:21
concept 10:3,6
    11:10 12:4
concern 23:6
concerned 21:14
concerns 15:9
concluded 26:18
conclusion 12:18
consensus 8:16
considered 23:19
contact 13:17
contained 27:6
contract 25:20,21
contractual 26:5
control 27:21
convey 14:4
copy 27:8
correct 27:8
counsel 2:6,13 5:6
    6:22 25:10
country 15:15
Court 1:1,21,21
cross-reactivity
    18:23,24 19:5
current 7:12
custody 21:12

**D**
D 3:1
dark 10:24
dark-haired 11:1

darker 22:8
data 15:7 16:10
David 2:3 5:19
Dawn 1:5 5:20 17:3
    18:2,7 19:15 20:7
    21:7,15 22:17,23
    24:20
dberlin@weisber...
    2:5
decide 8:5 15:7
decided 8:13 13:5
    14:17 16:23
decides 9:2,9,15
deciding 14:8
decision 8:18,21,22
    14:5 15:6 17:8
decision-making
    25:17
decisions 9:15
deemed 22:16
Defendant 1:10
    2:13
definitive 9:10
Department 2:8
    7:18 9:14 15:4
    16:2 23:18,19
    26:2
department's 19:8
    19:14
depending 17:16
depends 7:24 24:7
deposition 1:13 4:1
    5:22 6:21 7:6 17:4
    17:5 26:17 27:7
DESCRIPTION 3:12
detail 9:5 18:6
different 8:6 10:13
    10:13
direct 27:21
directing 14:19
DIRECTIONS 4:3
directive 19:9
directives 26:3
directly 13:12 15:5
Director 7:13
discriminatory 9:24
    12:12,19 13:21
    23:21
discussions 9:22
disregard 22:22
DISTRICT 1:1,1
documents 4:6
    21:6
doing 9:12 10:20
    13:6,18 14:9 16:4
Dr 5:19 25:13 26:11

driver's 11:17
drug 7:19 8:5 9:23
    10:21 11:3 12:1
    12:10 13:21 15:14
    15:20 16:16,22
    21:20
drugs 15:10 25:2
duly 5:13

**E**
E 3:1 27:1,1
EASTERN 1:1
either 13:18
employ 13:11
employee 7:13 24:3
Employment 2:10
entire 7:16
environment 23:8
environmental
    16:13,17 22:4
    23:5
ESQUIRE 2:3,9
et 1:9
evaluated 14:15
evaluation 8:24 9:3
event 24:4
evidence 27:5
exactly 6:1 8:9,13
EXAMINATION 3:5
    5:16
examined 5:14
examining 12:10
example 8:4 15:20
    21:17
excused 26:17
EXHIBIT 3:12
exhibits 3:10,15
experts 14:2
expose 10:20
exposed 23:7 24:6
exposure 11:2
    16:13,13,17 22:4
    23:5,10 24:2,15
external 22:11

**F**
F 27:1
fact 11:4,6
factors 22:11
fall 11:8
familiar 5:23 15:4
    25:6
far 21:13
Federal 11:24
filing 5:8
fine 6:23

Page 28

Case 2:20-cv-00395-KSM   Document 35-7   Filed 04/05/21   Page 10 of 12

Kennedy v. City of Philadelphia, et al.                                    GEORGE T. HAYES, M.D., 4/30/20

**first** 3:12 5:13 6:4
**Fleming** 1:23
**Floor** 2:11
**follows** 5:14
**foregoing** 27:19
**forgive** 12:6
**form** 5:9
**Frattali** 1:16 27:3
   27:13
**full** 6:17,18
**full-time** 8:1
**fully** 27:6

**G**

**GEORGE** 1:13 3:4
   5:12
**give** 6:2,16,18
   10:12 16:15 18:12
   23:9 24:18
**given** 25:2
**gives** 24:1,12
**go** 7:1 25:16
**going** 6:17 7:5
**good** 24:11
**greater** 9:5 18:6
**group** 9:1 16:3
**guess** 14:21

**H**

**hair** 8:7,13,19,24
   9:12,23 10:11,13
   10:14,23,23,23,24
   10:24 11:7,7,18
   11:22,23 12:10
   13:13,16,21 14:8
   14:9 15:16,18,20
   16:3,16 17:1,13
   17:17,19,24 18:8
   18:11,13,17 19:2
   20:3 21:23 22:8,9
   22:9,9,16 23:24
   24:1,1,14 25:17
   25:23,24 26:4
**hairs** 22:1
**Hammonton** 1:23
**happened** 7:6
**happens** 6:23 13:13
   16:6
**Hayes** 1:14 3:4 5:12
   5:19 25:13 26:11
**hear** 6:15 10:6
**heard** 10:3 22:21
**hemp** 18:18,19
**Hi** 25:13
**higher** 11:2
**hiring** 15:2

**historical** 11:3,5
   24:4
**historically** 10:15
   11:15 19:7,13
   20:2,11 22:7,14
**honest** 13:23
**honestly** 14:12 23:2
   25:5
**hundreds** 18:22

**I**

**impact** 9:24 12:12
   12:19 13:22 23:21
**impression** 17:18
   19:20
**included** 11:19
**incorporated** 11:24
**INDEX** 4:1
**individual** 10:20
**individuals** 8:17
   11:6 16:3
**influence** 6:10
**information** 4:6
   9:21 10:18 12:3
   14:1,3,4
**initial** 8:11
**initially** 14:7
**instructions** 6:3
**intact** 21:12
**intake** 19:3
**intentionally** 20:1
**interact** 9:17 15:5
**interactions** 15:14
**internal** 9:13 15:3
   16:1,9 19:13 25:5
**invalid** 20:8
**involved** 8:21,23
   15:21 22:11
**involvement** 15:24
**issue** 10:11,17
   11:21,22 13:5
   14:24 15:16 22:1

**J**

**Jersey** 1:23
**job** 21:16 22:18,23

**K**

**Kennedy** 1:5 5:21
   17:3 19:15,19
   20:7 21:7 24:20
**Kennedy's** 18:2
**kind** 9:24 14:24
**kinds** 8:6
**know** 5:22 6:14,15
   7:17 8:6,12,18

   9:11,18 13:20
   14:13,13,23 15:13
   16:23 17:10,12,13
   17:14,15 19:15
   20:7 21:2,13,17
   23:2,10,17,22
   24:20,23,24 25:19
   25:23 26:3,5
**known** 11:9 12:4

**L**

**lab** 13:13,18
**Labor** 2:10
**labs** 21:22
**LAW** 2:3,8
**learn** 10:9 12:18,21
   14:22,24 21:15
**legal** 15:13
**let's** 7:4
**level** 10:21 11:2
   12:14 14:18
**license** 11:17
**likelihood** 19:4
**liniment** 19:3
**little** 9:4 14:22
**long** 7:9,15 8:13
   11:9,12 12:4
**longer** 22:10 24:1
   24:14
**look** 15:7 16:10
   20:2 24:12
**looked** 19:1 21:7
   22:14
**looking** 24:8,9
**looks** 11:21
**lot** 21:18 22:17,23
   23:13

**M**

**M.D** 1:14 3:4 5:12
**makers** 14:5 15:6
**marijuana** 10:22
   16:21,22,24 18:13
   21:16,17 22:17,23
   23:8,11,16
**marked** 3:15 4:12
**matter** 18:10
**mattered** 22:24
**mean** 13:12 14:22
   19:23 22:22 23:22
**means** 27:21
**mechanism** 14:14
**mechanisms** 9:16
**medical** 7:13,13
   10:16 11:16 16:21
   16:22,23

**medically** 23:13
**medications** 6:11
   16:14,18
**meet** 18:4
**meeting** 20:24 21:4
**members** 26:1
**memory** 20:17
**mentioned** 18:7
**met** 5:21 19:16
**months** 5:21
**Morton** 2:4,4
**move** 20:1
**multiple** 8:16

**N**

**N** 3:1
**name** 5:19
**nature** 16:14 22:2
**negative** 24:4
**New** 1:23
**normal** 21:5
**normally** 21:1
**Notary** 1:17 27:15
**noted** 27:5
**notes** 18:4 27:6
**notify** 12:22
**number** 8:12

**O**

**oath** 6:5
**object** 6:23
**objection** 7:1
**objections** 5:8 27:5
**obligation** 6:8
**offer** 11:22
**offered** 24:21
**offering** 23:3
**office** 16:9
**officer** 8:1 10:17
   15:21 16:1,10
**Officer's** 11:16
**officers** 7:20 16:23
   25:1,20,22
**Oh** 12:5
**oil** 18:16,17,18,19
   19:3
**okay** 5:19 6:19 7:2
   7:17 12:2,5,8
   13:10 14:21 15:1
   15:19 17:2 20:15
   26:7
**onset** 15:18
**opinion** 23:3
**opportunity** 24:21
**opposing** 6:22
   25:10

**override** 13:6

**P**

**P.C** 2:3
**p.m** 1:15 26:16
**PAGE** 3:3,12
**PAGES** 4:4,7,10,13
**paraphrasing** 20:17
**Parkway** 2:10
**part** 11:18 12:21
   14:7 26:5
**partial** 10:12
**particular** 20:19
   21:8
**particularly** 18:16
   23:6
**parties** 12:16,16
**party** 24:8
**patient** 20:13
**pause** 6:17
**Pennsylvania** 1:1
   1:22 2:4,12 23:14
**people** 9:17,22 13:1
   14:19 22:7,8
**percent** 18:24
**period** 11:12 24:13
   25:4
**periodically** 14:14
   14:17
**periods** 22:10
**person** 11:1 16:12
   17:17 18:15
**person's** 10:23
**Philadelphia** 1:9,22
   2:8,12 7:10,18 8:5
   9:23 13:10 23:18
   23:19 25:1,19,22
**phone** 6:15
**physical** 9:12
**pick** 8:7,9
**Pike** 1:23
**plaintiff** 1:6 2:6
   5:20
**plate** 15:17
**Please** 12:6
**point** 6:21 8:12
   10:11 11:1,16
   13:4 19:8,21
**police** 7:18,20 8:1
   9:14 15:4 16:2,23
   19:14 21:18 23:18
   23:19 25:1,19,22
   26:1
**policy** 14:9
**positive** 15:21 16:7
   16:15 17:1 18:12

Case 2:20-cv-00395-KSM   Document 35-7   Filed 04/05/21   Page 11 of 12

Kennedy v. City of Philadelphia, et al.                                    GEORGE T. HAYES, M.D., 4/30/20

19:12 22:10,12
  24:2 25:1
**possible** 6:22
**potential** 16:12
  22:4 24:1,13,14
**potentially** 12:11
  19:10 23:20
**practice** 12:11 14:9
**practices** 9:8
**preceding** 27:7
**Present** 2:6,14
**previous** 22:21
**previously** 14:1
**privileged** 9:20
**probably** 8:16
**procedures** 25:24
**proceedings** 27:5
**process** 5:23 7:22
  8:23,24 10:21
  11:19 13:7 14:8
  14:22 15:3 16:5
  21:11 22:6 25:17
  26:5
**product** 19:2,2,3
  21:24 24:6
**products** 18:8,11
  18:18 19:10 23:7
**Professional** 1:16
  27:4,14
**program** 11:18,24
**Public** 1:17 27:15

_____
Q

**qualified** 13:20
**quality** 22:8
**question** 5:9 6:17
  7:2 11:20 12:3
  13:16,19 16:12,20
  20:6 21:8 22:7
**questions** 4:12
  13:15 14:13 20:3
  25:15
**quick** 25:15
**quite** 18:14
**quoting** 20:20

_____
R

**R** 2:9 27:1
**ramifications** 15:14
**re-test** 17:7,8,23
**read** 18:4
**reading** 5:7
**really** 7:24 12:14
  15:4,5 17:14 25:6
  25:15 26:6
**reason** 16:15 22:15

23:2
**reasonable** 16:24
**reasons** 19:12
**recall** 18:2,7
**recertification**
  10:17
**recite** 13:24
**recited** 13:24
**record** 7:7
**recreationally**
  21:19
**red** 10:23
**REFERENCED**
  3:12
**regard** 15:17
**regarding** 11:22
  13:16 15:10 16:12
**regards** 23:3
**Registered** 1:16
  27:3,14
**relate** 26:4
**related** 12:24 14:2,3
**release** 22:4
**releases** 22:3
**remember** 18:6
  20:21
**reporter** 1:16 5:1
  27:4,15,22
**Reporters** 1:21
**REPORTING** 1:21
**represent** 17:2,6
**representation**
  20:16
**represented** 17:5
**reproduction** 27:20
**REQUESTS** 4:6
**reserved** 5:10
**resign** 24:21 25:3
**respond** 6:18 21:1
  21:2
**responding** 21:5
**responsible** 12:9
**result** 16:7
**results** 10:13 16:10
**review** 10:17 11:16
  16:9
**revisited** 14:10
**right** 7:4 25:9
**rise** 16:15 18:12
**Robin** 1:16 27:3,13
**role** 12:21 15:19
**run** 18:14
**runs** 24:7

_____
S

**saliva** 23:23

**sample** 17:1,16,20
  17:22,23 22:12,16
**samples** 22:9
**saying** 12:18,19,20
**says** 19:9
**sealing** 5:7
**sec** 25:8
**second** 17:15,20,22
  24:18
**see** 20:12 21:11
  24:3,12
**selects** 7:18
**Sergeant** 16:8,11
  17:6 18:5 21:3
**Services** 7:14
**sets** 9:8
**short** 25:4
**significant** 13:4
**signing** 5:7
**simply** 12:3
**sit** 16:11
**situation** 18:15
  24:5
**smell** 23:10
**smoking** 23:10,16
**Solicitor** 2:9
**sorry** 12:5
**sort** 9:7 25:2
**South** 2:4
**speaking** 6:24
**specific** 8:14 15:19
  20:9
**specifically** 17:13
  18:3 19:18
**specifics** 21:9
**split** 17:16
**start** 8:19
**started** 7:4
**State** 23:14
**stated** 20:14
**STATEMENTS** 4:9
**STATES** 1:1
**station** 21:18
**stipulations** 4:9 5:2
**stood** 15:11
**stop** 6:24 13:6
**Street** 1:22 2:11
**studies** 10:10,14
**Suite** 1:22
**SUMMIT** 1:21
**supervision** 27:22
**supply** 13:14
**SUPPORT** 4:1
**supposedly** 18:21
**sworn** 5:13

_____
T

**T** 1:13 3:4 5:12 27:1
  27:1
**take** 15:9 19:14
  24:19
**taken** 1:14 22:18
  27:6
**talk** 21:23
**talked** 9:19
**talking** 20:12
**Teleconference**
  1:13 2:6,14
**tell** 5:13 6:8 8:9,15
  12:15 15:1,2
  19:18 23:4 24:15
**terminate** 17:9
**terminated** 24:22
  25:3
**test** 8:7,8,10,11 9:9
  9:24 10:22 12:10
  13:18,21 14:5
  15:21 16:6,16
  17:23 19:17,20
  20:9,19 21:3,8,9
  23:20 25:1
**tested** 11:1 17:20
**testified** 5:14
**testify** 6:12
**testing** 8:14 9:8,12
  10:21 11:18,19,23
  12:1 13:6,13,14
  14:8,10 15:14,18
  15:20 16:3,4,4
  17:13 20:3 21:24
  23:23,24,24 25:23
  25:24
**tests** 7:19 8:5,19
  25:17
**tetrahydrocanna...**
  19:11
**texture** 15:16 22:3
**Thank** 26:7,9
**Thanks** 26:10
**THC** 19:10 23:7,9
**Their's** 23:24
**thicker** 22:9
**thickness** 10:14
  11:7
**thing** 14:16 20:13
  23:24 24:2,4
**things** 16:14,19
  17:4 20:13 21:18
  21:23
**think** 11:13 12:23
  13:2,20 14:15
  20:2,23 21:10

24:10,11
**thought** 12:5 19:16
  20:8,19 22:14
**Thursday** 1:14
**TIFFANY** 2:9
**tiffany.r.allen@p...**
  2:13
**time** 5:10,24 6:18
  7:16 8:10 11:12
  14:11,11 22:10
  24:7,13,19 25:4
  26:11
**times** 21:16
**title** 7:12,15
**today** 6:5 18:16
**told** 17:7 19:15 20:7
  20:18
**totally** 6:23
**toxicological** 19:21
**toxicologist** 13:8
  13:17 23:1
**toxicologists** 11:14
  13:1,11,15
**toxicology** 19:21
**transcript** 27:8
**trial** 5:10
**true** 17:24
**truth** 5:13 6:8
**trying** 14:21
**types** 7:18 8:5
  18:22

_____
U

**understand** 6:4,7
  7:2
**undoubtedly** 15:15
**union** 25:21 26:1
**unit** 2:10 9:13,14
**UNITED** 1:1
**urinalysis** 8:7
**urine** 8:10 13:13,16
  17:1,15,23 19:12
  23:23 26:4
**use** 8:6 9:9 16:20
  18:17,17,21 19:2
  19:9 25:17
**Usual** 5:1
**usually** 13:12 14:18
  17:18

_____
V

**valid** 19:17,22 20:8
  21:3
**validity** 15:10,11
**vape** 23:12
**vaping** 23:7,9

Page 30

Case 2:20-cv-00395-KSM   Document 35-7   Filed 04/05/21   Page 12 of 12

Kennedy v. City of Philadelphia, et al.                              GEORGE T. HAYES, M.D., 4/30/20

variance 21:13
versus 8:1 10:23,24
**Videographers**
   1:21
view 11:17 13:4
   19:8,22
VS 1:7

**W**

waived 5:8
Walnut 1:22
want 9:18 11:20
   24:3
wanted 25:16
washing 21:24 22:6
way 13:8 20:1,4
   21:1,2,5
we'll 6:3,24
we're 6:14 22:19
we've 18:24
WEISBERG 2:3
Williams 16:8 17:6
   18:5 21:4
willing 15:9
window 24:1,7,14
   25:2
witness 3:3 26:9,17
word 20:17,17
work 9:22 16:17,17
   25:22
worked 7:9
working 9:1
workings 15:3
workplace 12:1
works 12:9 16:8
worthwhile 15:8
wouldn't 17:8
wrong 17:19
www.summitrep...
   1:24

**X**

X 3:1

**Y**

Yeah 9:6
years 7:11 8:12
   10:8,19 12:7
yesterday 17:4
   20:18

**Z**

**0**

08037 1:23

**1**

12:00 1:15
12:30 26:16
13 18:24
15 10:7,19 12:7
1500 1:22
1515 2:11
1610 1:22
16th 2:11
19070 2:4
19102 1:22 2:12

**2**

20-CV-0395 1:10
2020 1:14
215 1:23
25 3:7
267 2:12

**3**

3/27 18:5
30 1:14
35 7:11

**4**

424 1:23
447-8648 1:23

**5**

5 3:6 4:10
567-3315 1:23

**6**

609 1:23
610 2:5
626-9016 2:12
690-0801 2:5

**7**

7 2:4

**8**

800 1:23

**9**

90-day 24:13
985-2400 1:23