UNITED STATES DISTRICTCOURT
EASTERN DISTRICT OF PENNSYLVANIA (Philadelphia)

| | | |
|---|---|---|
| DAWN KENNEDY | : | |
| | : | |
| Plaintiff, | : | NO. 20-cv-00395-KSM |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA | : | **JURY TRIAL DEMANDED** |
| | : | |
| Defendant. | : | |

**PLAINTIFF'S SUR-REPLY IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTIO FOR SUMMARY JUDGMENT**

**1. The City mischaracterizes the statistics and their import to this case**

First, the City references approximately 24,000 officers that were drug tested, but only 2,388 hair tests were performed. The rest were by urine testing. The City has not provided the results of those urine tests. There are likely urine positives in that larger group. So, the characterization that there were four (4) positives for marijuana out of about 24,000 is not accurate.

Next, the City argues that the only statistics that are probative in this case are marijuana positives. That is incorrect.

Plaintiff's contention is that hair testing is racially biased for all drug testing. Plaintiff belongs to the group of officers that received a hair test and tested positive for any drug.

This is consistent with Plaintiff's complaint.

Upon information and belief, discovery will show that hair sample drug tests are not reliable in determining whether an African American person is using **any type of drugs**. Due to environmental factors, a person can just as easily test positive for drugs if they were in contact or in an area that had the drug. The drug particles may get trapped to a person even if they did not use the drug. (Exh. A – Plaintiff's complaint, para. 12)

That said, Plaintiff is not relying on theoretical allegations. Discovery *proved* these allegations. The City's own data shows hair testing is racially biased: to wit, African American officers are for more likely to test positive for any drug using hair tests compared to urine tests. (Exh. C to Plaintiff's prior brief (Kidwell Report dated 1/23/21, Figure 2, pg. 3; Figure 6, pg. 6)

The City next argues that because 99 percent of officers had no adverse outcome, there is no disparate impact, but that is poor logic. It is the number with an adverse outcome that is important. For example, if you test 1,000 African Americans and 1,000 Caucasians, 99% of the African American individuals being negative means 10 were positive. If one (1) of the Caucasian cohort were positive, it is a biased test.

The First Circuit analyzed the same concept in disparate impact cases where the total number of positives examined by the lawsuit were small. *See* Jones v. City of Boston, 752 F.3d 38 (First Cir. 2014) (Exh B to this brief). That court explained that even though there were very few positives overall, the question was not how many officers were tested, but whether the differences in outcomes associate with race are random or cannot be attributed to chance alone. Id.

That court found there was statistically significant evidence of disparate impact even with a small sample size. The court further explained that randomness cannot "be viewed as other than a very unlikely explanation for results…" Id.

Applying this concept to this case, Dr. Kidwell showed the differences in outcomes by race in the City's testing cannot be attributed to chance alone:

> …where I consider only those individuals who were randomly selected… the number of hair positives drops to 14 but the odds ratio increases to 14.8, which is statistically significant even with these low numbers at the 95% CI. A graph of the results is depicted in Figure 6. Officer Kennedy is part of this group and maybe that is the best comparison of all. (Exh. C, Figure 6, pg. 6)



Figure 6 – Individuals who were hair positive for any drug and who were selected at random.

…Statistical analysis showed that hair testing by the City had a disparate impact on African Americans. Officer Kennedy is a select member of that group who was randomly chosen for hair testing and was positive. This random group had an odds ratio of 14.8 (i.e. 14.8 times more black individuals (in proportion to their population) were selected than white individuals), which was statistically significant at the 95% CI. Id. at pg. 9.

In other words, this is a statistically significant pattern, which cannot be explained by chance alone.

It is also undisputed that testing positive is grounds for termination. Therefore, African Americans have been subjected to terminated (or forced to resign) at a rate of 14.8 times more than Caucasians.

Moreover, as previously briefed, there is no rigid mathematical formula Plaintiff needs to show if using statistics. The Supreme Court has described a *prima facie* showing of disparate impact as "essentially a threshold showing of a significant statistical disparity . . . **and nothing more**." Ricci v. DeStefano, 557 U.S. 557, 587 (2009).

As a matter of law, Plaintiff has now met her summary judgment burden.

2. **Statistics are not Plaintiff's only evidence**

The City frames the argument as if Plaintiff's only evidence is the City's statistics. That is not true.

Dr. Kidwell explains several reasons why there is a statistical disparity: African American hair type and cosmetic preferences.

Dr. Kidwell's conclusions are not theoretical: 1) Plaintiff has an African American hair type, 2) she saturated her hair in cosmetic oil, and 3) Plaintiff's hair was tested at too long of length, because African American hair is very curly and difficult and time consuming to align and cut to length during the collection process, as Plaintiff's sample was not.

The City's hair testing does not account for any of these factors.

Without rehashing Plaintiff's prior brief and Dr. Kidwell's reports, Plaintiff's case is strengthened even more by the fact that Plaintiff had contemporaneous negative urine and hair tests. Importantly, the second hair test used hair that was not saturated in oil and cut to the correct length.

Plaintiff's expert scientifically proved she had a false positive (she is innocent).

3. **The City cites no authority for its argument that a disparate impact case requires Plaintiff to show statistics *and* then show every other positive test was a false positive**

Defendant tries to deflect Plaintiff's evidence of a false positive, by inserting a new heightened burden that even with statistics, Plaintiff must then determine if all other positives were false positives.

Defendant cites no authority for this heightened burden, because there is none.

Plaintiff has already met her statistical/evidentiary burden (discussed above). (Exh. C).

Plaintiff does not need to go back and forensically prove every other positive test was a false positive.

That said, the fact that Plaintiff *has* proved she had a false positive, and that the false positive was specifically caused by racial factors: hair type and ethnic hair products, further proves the point that these statistics above are not a coincidence.

Ultimately, Plaintiff has done enough at this stage to meet her evidentiary burden. Ricci; Jones.

In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" Scott v. Harris, 550 U.S. 372, 378 (2007).

Defendant would have this Court give it the benefit of all inferences – the opposite standard.

4. **Green is not analogous**

The City mischaracterizes Judge Wolson's opinion in the Green v. City of Philadelphia case. Judge Wolson agreed statistical evidence is not required at all, but there must be some evidence that the policy at issue caused an adverse impact. (Exh. C – Green MSJ memorandum).

Judge Wolson concluded that Green had no evidence, "**statistical or otherwise**", except for his expert's report. Id.

Green did not rely on statistics from the City, Green was bald and did not use ethnic hair care products, and Green did not have multiple exculpatory drug tests (Green had one negative urine test, and several positive hair tests with hair taken from his chest). Green primarily relied on his expert's citations to outside studies in his field of expertise.

Here, there are statistics and additional evidence that Plaintiff had a race-related false positive. The evidence and expert conclusions from these cases are simply not the same.

5. **Plaintiff has offered evidence to show that the City failed to adopt an alternative test with a less disparate impact**

First, as Plaintiff argued in her motion to compel (Docket No. 25), the City's statistics regarding other drugs are also relevant to the third prong of the disparate impact analysis: whether the City can adopt a less discriminatory alternative practice.

Defendant contends Plaintiff provides "no evidence" of an alternative method with a less discriminatory impact. That is false. Plaintiff's expert conducted an analysis of the City's testing for all drugs and found hair positives skewed far more towards African Americans than urine results:



Note that the urine proportions very closely mirror the general population in Figure 1a whereas the hair positive tests are skewed to the Black individuals.

Another way to look at Dr. Kidwell's analysis is that he showed African Americans are <u>14.8</u> times more positive than Caucasians. Urine tests, by comparison, did not show any meaningful racial disparity. (Exh. C to Plaintiff's MSJ response, pg. 6).

Randomness cannot "be viewed as other than a very unlikely explanation for results…" <u>Jones</u>.

Defendant next argues that hair is still better because it detects drugs for a longer period of time. The City then falsely claims that Dr. Kidwell concedes hair is more accurate. He does not do that.

On the contrary, Dr. Kidwell explains "one cannot determine drug use from a single test." (Exh. B to Plaintiff's prior brief, pg. 14). Hair testing only shows who has been <u>exposed</u> to drugs. Exposure is different than intentional use. Dr. Kidwell explains that a positive hair test should require additional urinalysis to ensure an accurate understanding of drug use versus drug exposure. <u>Id</u>.

Dr. Kidwell further explains hair testing does not detect steroid use:

> By identifying individuals who are potential drug users, one can apply technology that really determines if that individual is a drug user. Urinalysis is such a technology. I outlined in my initial report how to use urinalysis in conjunction with hair testing in an enlightened manner that meets or actually improves the current system, and does it in a way that is not racially biased. As an aside, SAMHSA (guidelines) appears to suggest using my approach or something akin to it. Additionally as currently practiced, hair testing does not detect steroid use whereas seven officers in this subset were steroid positive (two were positive for other drugs via hair testing)! Steroids have been linked to aggression. (Exh. C to Plaintiff's prior brief, pg. 9).

The City claims it already utilizes a combination of testing. In actuality, Plaintiff's case shows that if someone tests positive for hair, even with a contemporaneous negative urinalysis and contemporaneous second negative hair test, that officer will still be terminated. The City could care less what the additional tests show.

For all of the reasons above, Plaintiff has shown there is an alternative method that would have a less discriminatory impact, which would not add a meaningful financial burden on the City (because the City is already urine testing), but which the City refuses to adopt.

In sum, regarding the third prong of the disparate impact analysis, Plaintiff has met her burden at this stage of showing a less discriminatory alternative. <u>Ricci</u>; <u>Jones</u>; <u>Scott</u>.

**6. Dr. Kidwell is qualified to opine about the City's statistics**

Statistics are an integral and important part of Analytical Chemistry studies, which is Dr. Kidwell's area of expertise. Dr. Kidwell education included statistics and he frequently uses

statistics to this day. Dr. Kidwell's foundational paper entitled "Comparing two analytical methods: minimal standards in forensic toxicology derived from information theory" is partially statistical in nature.  Dr. Kidwell's encyclopedia article entitled "Accreditation of forensic laboratories", in the Encyclopedia of Forensic Sciences also discusses statistics. (Exh. D to Plaintiff's prior brief – Dr. Kidwell's CV). Dr. Kidwell is qualified to use statistics.

Further, a statistician is not needed to follow a formula of simple multiplication and division, which is Dr. Kidwell's methodology here.

In addition, while Defendant takes issue with Dr. Kidwell's credentials, the City had the opportunity to take expert discovery including Dr. Kidwell's deposition to examine him regarding his background and experience. The City chose not to do so.

Dr. Kidwell's experience are subjects for voir dire and cross-examination at trial – not a basis to strike the report and opinion.

At this stage, however, Dr. Kidwell's findings are admissible and respectfully should be considered.

**7. While the City argues Dr. Kidwell cannot use statistics, it ignores that its own expert, Dr. Kadehjian uses statistics but is not a statistician**

Finally, it is worth pointing out that while the City contends Dr. Kidwell cannot considers statistics, their own expert does so but is not a statistician. (Exh. D, Dr. Kadehjian supplemental report dates 1/21/21) (Exh. E – Dr. Kadehjian CV).

This is blatant hypocrisy.

Dr. Kadehjian's analysis is flawed, however, because he does not differentiate between "for cause" testing and random testing.

Dr. Kidwell separates out random testing in his analysis.

The problem with "for cause" testing is that if individuals know, for example, that they are being tested by urine every 30 days, they are more likely not to use drugs, which explains why hair will show more positives. It is not because hair is more accurate.

**WEISBERG LAW**
/s/ David A. Berlin
David A. Berlin, Esq.
PA Attorney ID No. 314400
Matthew B. Weisberg, Esq.
PA Attorney ID No. 85570
7 South Morton Ave
Morton, PA 19070
610-690-0801
Fax: 610-690-0880
Attorneys for Plaintiff

**MILDENBERG LAW FIRM**
/s/ Brian R. Mildenberg, Esq.
Brian R. Mildenberg, Esq.
PA Attorney ID No. 84861
1735 Market St.,
Suite 3750
Philadelphia, PA 19103
215-545-4870
Fax: 215-545-4871
brian@mildenberglaw.com
www.MildenbergLaw.com
Attorney for Plaintiff

UNITED STATES DISTRICTCOURT
EASTERN DISTRICT OF PENNSYLVANIA (Philadelphia)

| | | |
|---|---|---|
| DAWN KENNEDY | : | |
| Plaintiff, | : | NO. 20-cv-00395-KSM |
| v. | : | |
| CITY OF PHILADELPHIA | : | **JURY TRIAL DEMANDED** |
| Defendant. | : | |

## CERTIFICATE OF SERVICE

I, David A. Berlin, Esquire, hereby certify that on this 26th day of April 2021, a true and correct copy of the foregoing Plaintiff's Sur-Reply in Support of Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment was served via ECF upon the following parties:

Kia Ghee, Esq
City of Philadelphia Law Dept.
1515 Arch Street, 16th Floor
Philadelphia, PA 19102

**WEISBERG LAW**
/s/ David A. Berlin
David A. Berlin, Esq.
PA Attorney ID No. 314400
Matthew B. Weisberg, Esq.
PA Attorney ID No. 85570
7 South Morton Ave
Morton, PA 19070
610-690-0801
Fax: 610-690-0880
Attorneys for Plaintiff

**MILDENBERG LAW FIRM**
/s/ Brian R. Mildenberg, Esq.
Brian R. Mildenberg, Esq.
PA Attorney ID No. 84861
1735 Market St.,

Suite 3750
Philadelphia, PA 19103
215-545-4870
Fax: 215-545-4871
brian@mildenberglaw.com
www.MildenbergLaw.com
Attorney for Plaintiff