IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SERGEANT AARON GREEN**, *Plaintiff* v. **CITY OF PHILADELPHIA,** *Defendant* | Case No. 2:19-cv-03156-JDW |

# MEMORANDUM

The Philadelphia Police Department ("PPD") tests officers for drug use, as it should. It uses a method, hair testing, that some experts think exposes African American officers to a heightened risk of a false positive on a drug test. Aaron Green was an African American officer who had three hair follicle tests come back positive for cocaine, despite his protestation that he has never used the drug. He might be telling the truth, but that's not the question before the Court. Instead, the issue is whether the PPD's use of hair follicle testing has had a disparate impact on African American officers. On that score, Mr. Green has no evidence at all, statistical or otherwise. Although his expert witness posits that testing creates an elevated risk of a false positive, Mr. Green has not shown that the risk translates into an actual impact. He would have to do so to maintain a disparate impact claim. The Court will therefore grant the City of Philadelphia's summary judgment motion.

I.  **FACTS**

    A.  **The Philadelphia Police Department's Hair Testing Practice**

The Philadelphia Police Department uses urinalysis and hair testing to detect possible drug use among its officers. Since 2014, the Department has administered hair drug tests to 7,900 African American officers, 13,170 Caucasian officers, and 96 officers who self-identify as "other." (ECF No. 24-1 at ¶ 38.) Of those, five officers tested positive for cocaine—three African American officers, one Caucasian, and one officer identified as "other." (*Id*.)

    B.  **Mr. Green's Hair Test**

From September 1991 until November, 2018. Mr. Green worked for the PPD and rose to the rank of Sergeant. He maintains that he has never used narcotics. He had approximately 20 negative drug tests prior to November 2, 2018. On that day, he failed a drug test because samples of his chest hair tested positive for cocaine. His urine tested negative, but it was noted as "dilute," meaning that there was too much water in the urine to permit an accurate test. Mr. Green contends that his urine was diluated because he takes a diuretic to treat diabetes. On November 13, 2018, the PPD administered a reconfirmation hair test, and that test also tested positive for cocaine. He had a second urine test that day, and it again came back negative. On November 19, 2018, Mr. Green went to a different lab and commissioned his own, third drug test. That test again resulted in a negative urine test but a hair test that was positive for cocaine. Mr. Green's positive drug test result was reported to Internal Affairs. His representative from the Fraternal Order of Police advised him to retire or be fired. Based on this advice, Mr. Green retired.

### C. The Accuracy Of Hair Drug Tests

The parties submitted conflicting expert reports on the accuracy of the hair drug test. Initially, Mr. Green retained Dr. William Cox, a forensic pathologist, who concluded that African American hair may become contaminated with cocaine in the environment and without ingestion. That could therefore result in a false positive. But Dr. Cox later withdrew his report because he believed it did not apply to this case. Mr. Green's second expert, Dr. Sol Bobst, opined that "hair testing causes racial disparity for African Americans, compared to Caucasians" because "African American hair is more susceptible, and more likely to result in a false positive testing scenario." He concluded that Mr. Green's positive hair test was "only an indication that cocaine was present in the hair samples tested" and was not "definitive proof that Mr. Green illicitly or intentionally ingested, inhaled, or injected himself with cocaine."

Unsurprisingly, the City's expert, Dr. Leo Kadehjian, disagreed with Dr. Bobst's assessment. Dr. Kadehjian opined that "hair testing for drugs of abuse is an internationally-recognized and established scientific method for detection of drug use. . . ." (ECF No. 24-19 at 3.) Additionally, Dr. Kadejhian opined that there is no evidence of racial bias in hair drug testing. Finally, Dr. Kadeijhian concluded that Mr. Green's positive hair drug test was consistent with ingestion of cocaine.

### D. Procedural History

On September 23, 2019, Mr. Green filed this lawsuit claiming that the PPD's use of hair samples for drug testing has a disparate impact on African Americans in violation of Title VII. Additionally, Mr. Green asserts a claim against the City for municipal liability under 28 U.S.C. § 1983 for a violation of the Equal Protection Clause. The City filed a motion for summary

judgment, arguing that Mr. Green does not have evidence to support either of his claims. That motion is ripe for decision.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he plain language of Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quotations omitted). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted). However, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted). The movant is entitled to judgment as a matter of law when the nonmoving party fails to make such a showing. *See Celotex*, 477 U.S. at 323.

## III. ANALYSIS

### A. Title VII Disparate Impact Claim

"Title VII makes it unlawful 'to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Meditz v. City of Newark*, 658 F.3d 364, 370 (3d Cir. 2011) (quoting 42 U.S.C. § 2000e–2(a)(1)). A plaintiff can bring a Title VII claim without

4

showing discriminatory intent under a disparate impact theory. *See id.* Disparate impact claims follow a three-step burden-shifting framework. *See N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 476 (3d Cir. 2011). "First, a plaintiff must establish a *prima facie* case of disparate impact discrimination by demonstrating 'that application of a facially neutral standard has resulted in a significantly discriminatory. . . pattern.'" *Boyle v. City of Philadelphia*, No. CV 17-262, 2020 WL 4459131, at *4 (E.D. Pa. Aug. 4, 2020) (quoting *Newark Branch, N.A.A.C.P. v. Town of Harrison, N.J.*, 940 F2d 792, 798 (3d Cir. 1991)). Next, if a plaintiff makes out a *prima facie* case, the burden shifts to the employer to show "that the challenged practice is 'job related for the position in question and consistent with business necessity.'" *N. Hudson*, 655 F.3d at 477 (quoting 42 U.S.C. § 2000e-2(k)(1)(A)(i)). "Finally, a plaintiff can overcome an employer's business-necessity defense by showing that alternative practices would have less discriminatory effects while ensuring that candidates are duly qualified." *Id*.

To establish a *prima facie* case, "a plaintiff must (1) identify a specific employment policy or practice of the employer and (2) proffer evidence, typically statistical evidence, (3) of a kind and degree sufficient to show that the practice in question has caused" an adverse impact, such as exclusion of applicants for jobs or promotions, "(4) because of their membership in a protected group." *Stagi v. Nat'l R.R. Passenger Corp.*, 391 F. App'x 133, 140 (3d Cir. 2010). Although mathematical certainty is not required, a plaintiff must demonstrate that the disparity "is sufficiently large that it is highly unlikely to have occurred at random. . . ." *Id*; *see also Meditz*, 658 F.3d at 371 ("Once the employment practice at issue has been identified, causation must be proved; that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group.") (quoting *Watson v. Fort Worth*

*Bank and Trust*, 487 U.S. 977, 994-95 (1988)); *N. Hudson*, 665 F.3d at 476 ("This *prima facie* showing requires the plaintiff to prove a significant statistical disparity and to 'demonstrate that the disparity [he] complain[s] of is the result of one or more of the employment practices that [he is] attacking.'") (quoting *Wards Cove Packing Co., Inc. V. Antonio*, 490 U.S. 643, 657 (1989)).

Mr. Green has identified an employment practice: the PPD's use of hair tests as part of its drug testing regime. But has no evidence that that policy caused a disparate impact by causing a higher percentage of false positives in African American officers. On its face, the statistical evidence shows that .038% of African American officers, .008% of Caucasion officers, and 1% of "other" officers had positive tests. But this raw statistical data does not tell the Court anything relevant. It does not tell the Court whether any of those tests were false positives. Also, given the very small sample sizes of positive tests, the Court cannot infer a disparity. Mr. Green does not argue otherwise. In fact, he offers no statistical analysis at all.

Mr. Green argues that he can establish the *prima facie* case without relying on statistical evidence because his expert witness, Dr. Bobst, concluded that hair drug "testing causes racial disparity for African Americans, compared to Caucasians." (ECF No. 29 at 2.) But that argument misunderstands disparate impact claim requirements. To succeed on a disparate impact claim, Mr. Green must first show that City's hair drug test had an adverse impact on African American Officers (*e.g.*, significant pattern of firing African American officers for failing the hair drug test). Dr. Bobst's testimony does not show this. Instead, the most that it establishes is that there is a risk of a disparate impact. But Mr. Green cannot make out a *prima facie* case by establishing a latent risk that the policy will cause a disparate impact. He must show that the policy has actually had such an impact.

6

The cases that Mr. Green cites do not dictate a different outcome. Mr. Green is correct that the use of statistical evidence is not required. But regardless of what evidence Mr. Green uses, he must still establish that the policy at issue caused an adverse impact. He has not done so. Moreover, as explained by a case to which Mr. Green cites, "[t]here are cases, to be sure, where courts have excused a plaintiff's failure to provide statistical analysis. But these are few, far between, and only where the raw numbers evince the most egregious disparities." *Luceus v. Rhode Island*, No. CV 15-489 WES, 2018 WL 1626263, at *6 (D.R.I. Mar. 30, 2018), *aff'd*, 923 F.3d 255 (1st Cir. 2019). This is not such a case. As a result, Mr. Green cannot sustain his disparate impact Title VII Claim.

### B. Section 1983 Claim

To establish a §1983 claim for a violation of the Equal Protection Clause, a plaintiff must demonstrate (1) "the existence of purposeful discrimination" and (2) that "[he] received different treatment from that received by other individuals similarly situated." *Chambers ex rel. Chambers v. Sch. Dist. Of Philadelphia Bd Of Educ.*, 587 F.3d 176, 196 (3d Cir. 2009) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990). Mr. Green's claim fails for two reasons. First, he has proffered no evidence that he was treated differently than other police officers based on his race. Second, he has not shown intentional discrimination. In fact, the record demonstrates that the City administered the same test to Caucasian police officers as African American officers and imposed the same discipline on all officers who failed the hair test. As a result, Mr. Green cannot make out a Constitutional violation required to establish liability under §1983.

## IV. CONCLUSION

It is possible that Mr. Green never used cocaine. But even if the City's test results were wrong as to him, the City does not have to have a perfect testing methodology to comply with Title VII. It just has to have a methodology that does not discriminate. Mr. Green has no evidence that the City violates that rule. Therefore, the Court will grant City's motions for summary judgement. An appropriate Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.